**Anderson L. DOBBINS, Plaintiff,**

v.

**LOCAL 212, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, Defendant.**

**UNITED STATES of America by Ramsey CLARK, Attorney General, Plaintiff,**

v.

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 212, Defendant.**

**Civ. A. Nos. 6421, 6473.**

United States District Court
S. D. Ohio, W. D.

Sept. 12, 1968.

Orders Oct. 10, 1968.

416

Stephen J. Pollak, Asst. Atty. Gen., John J. Kirby, Jr., Michael J. Lightfoot, Gregory E. Fischbach, Attys., Dept. of Justice, E. Winther McCroom, First Asst. U. S. Atty., for the United States.

Norris Muldrow, Cincinnati, Ohio, Robert L. Carter, New York City, Richard F. Bellman, New York City, for plaintiff Dobbins.

Robert I. Doggett, and Smith, Latimer, Doggett & Swing, Cincinnati, Ohio, for defendant Local 212.

James W. Hengelbrok, and Gorman, Davis & Hengelbrok, Cincinnati, Ohio, for defendant J. A. T. C.

## OPINION

HOGAN, District Judge.

### INTRODUCTORY

#### Section I.

Somewhere between these two extremes lies the answer to the problem raised in this case. The Local Union 212 (hereinafter referred to as "U") has approximately 800 journeymen members. All are White (hereinafter abbreviated as "W"). U not only does not have, but it never has had a Negro (hereinafter abbreviated as "N") member. That is one extreme. As the Fifth Circuit said in State of Alabama v. United States, 304 F.2d 583 (1962, affirmed 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112):

> "In the problem of racial discrimination, statistics often tell much, and courts listen."

Compare the statistical recitations in Monroe v. Board of Commissioners, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968). Going to the other extreme for a statistic—since statistics may be bilateral—in March of 1968, a union electrical contractor, Incore Electric, and the successful subcontractor on two of the largest electrical construction projects in the Cincinnati area (being the building that is going on just west of this Federal Building and covering almost two blocks) in good faith addressed a letter to a representative number (practically all) of N contractors in the electrical business in this area. The contractor said that he had a present need for "several electricians of the minority group." He further called attention to the fact that

journeyman electricians, in his employ, were earning $5.55 per hour. Although this request was, on this record, known to individuals in the business and with the knowledge of the N electricians in this area, this good faith request was answered by only one person—who had no trouble with either the contractor or the U in obtaining and keeping employment.

■ In May, 1967, the plaintiff Dobbins (hereinafter referred to as "D") commenced an action against the U under Title 7 (42 U.S.C. § 2000e et seq.). The D action was also bottomed on 42 U.S.C. § 1981 (part of the statute of 1866).[1] The D action purported to be a class action. The fact that, on this record, D is the only N to have satisfied the procedural requirements of Title 7 before filing an individual action is neither here nor there. The Fifth Circuit has recently held that, assuming other de facto members of the class, a plaintiff who has satisfied the procedural requirements of Title 7 may sue on behalf of others similarly situated who have not gone through the procedural requirements. Oatis v. Crown Zellerbach Corp., 5 Cir., 398 F.2d 496 (July, 1968). However, Rule 23 F.R.Civ.P. does require a showing that there is more than one person in the class. On this record there is no one in D's class, as we shall see. D evidently agreed, since he took no step as required by the Rule. Furthermore, the prerequisites under Section (b) of Rule 23 are not here present. It is determined, therefore, that the D action is not a class action and not maintainable as such, but is an action on behalf of the individual plaintiff only.

On July 24, 1967, only a matter of weeks after the D action was filed, the United States, by Ramsey Clark, Attorney General, filed a Title 7 action against the U. Basically, the D action asserted discrimination with respect to membership in the U. Basically, the government action was directed toward claimed discrimination both in respect of membership and employment opportunities. On September 6, 1967, on motion of the United States, the two pending actions were consolidated. At the same time, as required by Title 7, the actions, as consolidated, were advanced. The trial was approximately a year after commencement, which is approximately a year and a half in advance of when the cases would have been reached on the docket as a matter of course. The point is that at a very early date in the history of these cases (i. e., a matter of a few months after filing and before any substantial discovery had been commenced) the Attorney General of the United States, in this Court, was actively pressing a claim which of necessity included the D claim, for all practical discovery, trial and evidentiary purposes, and in the light of that fact, there was no need in this District for a "private Attorney General" thereafter. Compare Newman v. Piggie Park, 390 U.S. 400, at 402, 88 S.Ct. 964, 19 L.Ed.2d 1263 (March, 1968).

The Cincinnati Joint Apprenticeship Training Committee in the electrical field (hereinafter simply "JATC") is a voluntary, unincorporated association, composed of six members. Each serves for a term of years. Three are designated by the U. Three are designated by the Cincinnati Chapter of the National Electrical Contractors Association (hereinafter "NECA"). It formulates and administers the apprenticeship training program in and for the jurisdiction of the U. In that connection, it incurs and pays expenses, which subject will be dealt with again herein. The funds of JATC are provided 50% by U and 50% by NECA. It is not controlled by either U or NECA—while the U members may want one or the other thing and NECA members may want something different, the conclusions of the JATC in such matters are arrived at by good faith bargaining.

---

1. Technically, the Civil Rights Act of 1866 was subsequently injected into the D case. In the interest of some brevity, in this and future instances, some accuracy, not affecting substance, will be sacrificed.

On April 9, 1968, after these cases had been assigned a trial date of July 9, 1968, and approximately a month after JATC had notice that such an effort would be made, the JATC was added as a defendant in Civil 6473; and on April 11, 1968, the United States filed an amended complaint against both defendants, adding the claim, as against JATC, of discrimination by reason of race or color in connection with JATC standards and admission to the apprenticeship program. The JATC first filed motions which were deferred for disposition until trial and which are dealt with hereinafter.[2] On June 10, 1968, the JATC answered.

It has been and still is the claim of the JATC that it had no adequate time prior to trial to prepare its defense and that it, therefore, was deprived of certain Constitutional rights. In an effort to set that claim at rest, the trial of this case was adjourned from July 24th to August 6, 1968; the government had rested its case on July 24 against both defendants, and the JATC was afforded the interim adjournment for preparatory purposes before putting on its case, so that, prior to the time the JATC was required to defend itself evidentiary-wise, there was a substantial period of time in which it knew exactly what it had to prepare itself for—and, of course, its preparation could only amount to self-discovery, which never presents anyone much problem. The trial extended over a period of approximately fifteen days, involves a record exceeding 3100 pages of transcript, and several hundred pounds of exhibits.

## Section II.

### The Facts With Respect to The U

1. The U is a labor organization, being an unincorporated association of members engaged in the electrical construction industry in Cincinnati and thirteen surrounding counties in Ohio, Kentucky and Indiana. The U's offices are in Cincinnati, Ohio.

2. U's membership policies are governed by its Collective Bargaining Agreement, by the constitution of the International, and by its own bylaws. The bylaws require the examining board of U to meet "at least once monthly for the examination of applicants when there are applicants to be examined." Four years' experience at the trade is stated in the Collective Bargaining Agreement as a condition for eligibility for examination and it is also therein provided that a reasonable interval of time between examinations is three months. The International constitution requires "quarterly" examination of applicants by a local when there are applicants to be examined.

3. While the U has at all times had applicants for membership, no membership examination has been given since 1963, excepting only in July of 1967, at which time an examination was held, which will be dealt with further hereinafter. Again, and this is the last time it will be mentioned—absolute accuracy is being sacrificed in the interest of substance. There are certain special instances in which what might be called a "special examination" is given; a civil service municipal employee may be examined at an odd time on his request and the request of the City. That type of thing has nothing to do with this case and our only concern is with the general or non-special.

4. The Collective Bargaining Agreement states that all employees of union contractors "shall be required to become and remain members of the U as a condition of employment from and after the 31st day following the date of their employment." U does not, and, at least since 1960, has not enforced this provision of the Collective Bargaining Agreement. During such time there has always been a substantial number of non-member employees "by referral," who have been employed for substantially more than 31 days. Even in instances in which such an employee has desired to become a member of the U and made his desires

2. in result (not in so many formal words)

known, he has not been admitted or given an exam.

5. U is a party to a Collective Bargaining Agreement with 62 electrical contractors who operate within the geographical area of U's jurisdiction.

6. In accordance with and as required by the Collective Bargaining contract, U operates an exclusive hiring hall for the referral of applicants to employment by contractors who are parties to the agreement (either original or who become such by "sign on"). U is required to maintain a register of applicants for employment in the electrical field. Applicants for employment are, by the terms of the agreement, divided into four priority groups.

Group 1 consists of applicants for employment with at least four years' experience in the trade, who are residents of the U's territorial jurisdiction and who have also passed a journeyman examination given by an IBEW local, and who have worked for at least one of the last four years under the U's Collective Bargaining Agreement. As a practical matter, this means membership of U resident of the area. Whether this does or should, or should not raise any problems under the Labor Management Act, 29 U.S.C. 151 et seq., is of no concern of ours. (29 U.S.C. 160(j)) Ours is only a Title 7 concern.

Group 2 consists of applicants for employment who have at least four years' experience in the trade and have passed a journeyman's exam given by an IBEW local. As a practical matter, that means non-resident members of another local and during the times of interest in this lawsuit, there have always been a number of non-resident members working on referral in the geographical jurisdiction.

Group 3 consists of applicants for employment who have at least two years' experience in the trade and are residents of the area and who have been employed for at least six months in the last three years under the U's Collective Bargaining Agreement. The great majority of non-member referrals are under this group 3.

Group 4 consists of applicants for employment who have worked in the trade for at least one year.

The referrals are to be made in accordance with the above priorities; however, there is no "bump off" as between these priorities. For example, a non-member in employment as a group 3 referral would not be bumped off by a member of group 1 who became unemployed and signed the referral book.

7. Under the Collective Bargaining Agreement, the union contractors must hire all their electricians through the U (again leaving out special matters which do not affect this case). A union contractor may go into the open labor market under the agreement if he has requested a man from the U and the U cannot refer a man within 48 hours of such a request. The contractor is required to classify an employee so hired (called "a 48-hour man") as temporary and he must notify the U of the man's name and Social Security number. A 48-hour man may be replaced by the U as soon as anyone becomes available for referral by the U.

8. W electricians in category 4 have been referred to union contractors. No N ever has. On occasion a W electrician has been sent by the U to specific contractors for the purpose of obtaining a letter requesting the U to refer him for employment. No N electrician ever has.

9. Employees directly hired by a union contractor and any non-member of U referred by U to a contractor, or vice versa, are required to purchase a building trades button at a cost of $5.00 a quarter and, in addition, at the time of referral the employee receives an introductory slip from U to the contractor. Stated otherwise, a union contractor will not and does not hire any electrician until he knows that the hiring is satisfactory to the U.

10. U maintains four separate books in its office for the registration of ap-

plicants for employment in the appropriate categories. The U does not, however, require applicants for employment to sign a referral book if work is available when the applicant comes into the office.

11. Membership in U confers the highest priority for referral to employment in the Cincinnati area and the second highest referral priority (out of 4) in every other IBEW construction local throughout the United States. Such membership in U confers significant additional employment opportunities.

12. U has approximately 800 journeymen members. All are W and always have been. U has never had an N member.

13. The number of members in U, at all times since July 2, 1965, has not been enough to meet the needs of the union contractors in the U's territorial jurisdiction. From July, 1966, to October, 1967, almost 1,000 electricians, who were neither members of U nor indentured apprentices, have been employed at some time for union contractors—practically all, if not all, by referral from the U, or vice versa. Of these, 359 individuals were members of other IBEW locals and were, therefore, in category 2, and were all W. With one exception, which took place in 1968, U has never referred an N under group 2. It had one opportunity previously to refer another N, which it did not do for reasons which it did not apply to W members of other locals. Of the almost 1,000 men so referred, 85 (also all W) were members of non-electrical unions. U has never referred an N member of a non-electrical union. During the same approximate 15-month period, 328 "48-hour men" were hired.

14. While it is true that in recent months (summer, 1968) there have been members of U out of work (due to an extended strike of other crafts in Cincinnati) it is at the same time true that at all times there have been employed by union contractors in the geographical area many more electricians in number than the total of U's membership. This is so, of course, because of the "no bump off" policy.

15. In October, 1967, a representative date insofar as this case is concerned, about 600 men, who were neither members of Local 212 nor indentured apprentices, were working for contractors—party to U's Collective Bargaining Agreement. All except two of these persons were W. One of these two was hired in August of 1967 as a result of the initiative of a union contractor. The other one also was employed as a result of a request by the contractor to the U for a referral. The circumstances surrounding the second N are of a complexity which will not be gone into. In a nutshell, this is the situation—no N was ever referred by U until August, 1967, and the referral then was at the specific request of a union contractor. Up until the time of the hearing of this case, only one other N had been referred and that was after the union contractor had specifically requested "electricians of the minority" and the second individual had been a member of an IBEW local at Middletown, Ohio. He was a class 2 referral. No N has ever been referred by U under category 4, although a substantial number of W's have been.

16. There is some tendency to classify "journeymen electricians" into such divisions as construction electricians and residential electricians. The term "journeymen linemen" is used, as well as the term "journeymen wiremen." The jurisdiction of this International Union and U covers and includes "the trade." For instance, the only qualifications of membership are "good character, over 16, and the passing of a satisfactory examination." "The trade" includes residential electrical work and construction electrical work. Furthermore, for all practical purposes, an experienced electrician who has acquired his knowledge by work in the residential areas and particularly in the rewiring of residential areas, will acquire the general knowledge necessary for him to work as an electrician for a subcontractor doing the electrical work in

a major construction project. As in everything else, there are special circumstances, and we are dealing with the generalities which will help to the general understanding of this case. For example, electricians working on the Fernald project in Southwestern Ohio or the Kyger Creek project in Southeastern Ohio might require some special skills which they would not learn in residential experience—that is to say, some of them would. However, in a major building project, while some electricians require special skills and exceptional knowledge, the majority of the electricians required could have acquired the necessary experience for their jobs in the residential areas. This record indicates affirmatively that the transition of an experienced residential electrician to a building electrician presents no problem of merit. So that it will not be helpful to go into a detailed explanation of the difference in the technical terms, with several limited exceptions. There are a very few people working under the jurisdiction of this U or in this trade who are called "groundsmen." They are laborers who work with their hands without benefit of machines on and in the ground, removing boulders and things like that. An apprentice, as the name implies, is one learning the trade. Variant from the source of the word (a barrister in old English law was an apprentice until he had practiced 15 years) an apprentice may be in his teens or in his 40's. That classification is divided into an indentured apprentice and an unindentured apprentice. An indentured apprentice, for the purposes of this case, is an apprentice being trained under the auspices of the JATC and obligated by contract with that Committee. An unindentured apprentice would include all others. Since the fall of 1967, by reason of negotiations between NECA and U (and/or their national counterparts) a union contractor may not employ an unindentured apprentice; so that since the fall of 1967 the only chance an unindentured apprentice has to learn the trade is via or with a non-union contractor. Simply to carry the matter to its end, a summer employee is not to be confused with any of these, meaning that with U approval, a union contractor may hire a summer employee for 90 days during the summer. This, of course, is temporary employment and not apprenticeship as such.

17. In the middle 30's U had approximately 300 members. By 1965 U had approximately 725 members. By 1967 it had approximately 865 members, which included 37 indentured apprentices from the 1966 class, who were initiated on October 11, 1967. The 1965–67 increase (beyond the apprentices) was, for all practical purposes, due to the absorption by U of another local. The bulk of the membership has been engaged in commercial and industrial work in fact. Apparently no one connected with U ever actually asks or answers the problem "How many members should this U have?" The factor which historically is the most important in relation to the answer to that question is this: the rock bottom employment in the jurisdiction. There used to be a conscious effort (and that effort, if it exists at all now, is unconscious) to maintain or limit the membership to the minimum of electricians which the U could be expected to keep in continuous employment in bad times. During an appreciable part of the three years prior to the effective date of the Civil Rights Act, the times in this trade in this area could be described as bad and both union contractors and union members had their employment problems.[3] Of recent years, the U has been picking up 35 members a year approximately from the JATC program. The attrition of recent years by reason of the death or retirement of active members is about 16 a year, or at the present time the annual gain is something in

3. In the summer of 1965 there were some members of U unemployed, for example. However, from the summer of 1966 to the summer of 1968 the electricians working under U's auspices always exceeded 1000 and reached a high point at one time in excess of 1200.

the neighborhood of 18 or 19. There is no showing in this record that the number of the membership has been maintained discriminatorily, nor is there any showing that the approximate net gain figure of 18 or 19 is unreasonable.

18. The International Constitution, read into U's bylaws, requires as a condition of membership, for our purposes, that the applicant be "employed in the trade." With the sole exception or exceptions hereinafter referred to, U had never administered an examination for membership to any person who had not at the time been actually working in the trade and for a union contractor.

19. The Collective Bargaining Agreement between U and the union contractors requires as a condition precedent to examination for admission that the applicant have "four years' experience at the trade." This requirement has existed since at least 1958 and it is a reasonable requirement and is not discriminatory per se, nor was it adopted for that purpose.

20. Leaving out again the small exception (such as a member of another local moving into this area, or such as persons employed as inspectors who must attain union membership, etc.) there exist today, and this has been true since July 2, 1965, only two paths [4] which one may traverse to become a member of U. One is to work four years in the trade for either a union or non-union contractor (whether W or N) and the other is to be admitted and go through the apprenticeship program administered by the JATC.

21. The U is bargaining representative for its members and the men under its referral in its geographical area with approximately 60 contractors who are either parties to or signers on to the bargaining agreement. The last bargaining agreement was effective June 1, 1965, although its negotiations were not concluded until the fall of 1966, so it is a "nunc pro tunc" one. There are a substantial number of non-union contractors in the geographical area, but the clear majority of the work in the trade, particularly in the building and construction end of it, is performed by the union contractors.

22. Since July 2, 1965, in excess of 400 W men obtained employment directly from union contractors, either as 48-hour men or as prospective employees referred to U by local union contractors. While we are unable on this record to break down the categories into numbers, this much is clear in respect to all of them, and without regard to whether the initiative of the contractor was related to the 48-hour clause or unrelated—the final O. K. was U's. The consistent precatory language in the contractor's letters points only to the conclusion that U's "Yes or No" was untrammeled.

23. Both before and after July 2, 1965, it was the policy of U not to accept an application for union membership from a W who was not at the time he filled out the application actually employed by a union contractor or employed in one of the special categories; that being consistent with U's unwritten rule that an examination for membership would be given only to one working in the trade for a union contractor. (See P.X. 6 containing the applications of some 117 W applicants who applied since January 1, 1965, and some few who applied previously thereto—very few of these applications indicate affirmatively that the applicant was "unemployed" and 90% indicate to the contrary.) It was the policy of U both before and after July, 1965, to immediately accept from any N who walked into its office a signed application for membership without regard to unemployment at the time of the N application. Of the 17 applications from N's received by U from 1962 to the time this lawsuit was filed, 13 indicate that the applicant was not employed, one indicates that the applicant was employed in a drug store as a porter, one indicates that the applicant was employed by a non-union contractor, one

4. *possible*, as distinguished from *practical* or judicially enjoined

indicates employment by the City of Cincinnati and one indicates "self-employment." (P.X. 5) Eight of these applications were signed and delivered to U after July 2, 1965.

24. The relationship of a member of U and U is that of contract. The International Constitution, read into the Local, provides that "the acceptance of an application and the admission of the applicant into a local constitutes a contract between the member, the local and the I.B.E.W., and between such member and all other members of the I.B.E.W." An applicant at the time of making his application is required to and does sign a contract "agreeing to conform to and abide by the constitution of the I.B.E.W."

25. Members of the U and electricians working under the referral system of the U enjoy certain financial benefits which are not enjoyed by electricians otherwise occupied or not occupied. In the case of a union member, these include participation in a group hospitalization program, in a special pension program, in union training and skill upgrading programs. A worker on referral enjoys at least one or more of these. In addition, a member has a right of approval along with other members over the U's Collective Bargaining Agreement which establishes wages and conditions of employment.

26. Since June, 1965, the minimum hourly rate of wages for men working under U's Collective Bargaining Agreement has been $4.90 per hour and that is substantially in excess of the wages earned by electricians employed by non-union contractors both W and N.

27. From early 1966 through June, 1968, there has been a state of full employment in the electrical trade field in U's territorial jurisdiction. Since June of 1968 there has been limited temporary employment as a result of a strike in the building trades industry in the Cincinnati area (not involving the U). This has shut down some very major projects and the strike continued during the time of this trial. Whenever this strike may be settled, the electrical trade industry in the area will return to full employment—the indexes used by electrical contractors to estimate the future in the industry locally indicate the grade will be up from normal in the foreseeable future.

28. Something in the neighborhood of 75% of the total dollar volume of contracts being performed by contractors who are party to U's Collective Bargaining Agreement is for publicly financed projects.

29. U has attempted both before and after July 2, 1965, to organize W non-union electrical contractors working within the U's jurisdiction and has attempted to obtain letter additions to the Collective Bargaining Agreement by such non-union W contractors.

30. Upon the letter assent by a non-union contractor to become party to the Collective Bargaining Agreement, the U permits the contractor to continue the employment of electricians on his payroll at the time of signing and the employees thereafter work under the conditions of employment set forth in the Agreement as U referrals.

31. The U has never attempted to organize an N contractor either before or after July 2, 1965; however, there is no evidence that after July 2, 1965, any N contractor was engaged in doing the type of work being done by a W contractor with respect to whom organizational efforts were directed since July 2, 1965. It is, therefore, found that there has been no discrimination in organizing or failing to organize non-union contractors.

*Section III.*

*The N Applicants for Membership*

1. In the history of U since 1960, 18 N's have applied for membership. None have been admitted. Of these 18, nine have applied since July 2, 1965.

2. Evidence of discrimination ante-July 2, 1965, is not relevant or competent in respect of any objective problem of discrimination subsequent to that date. There is no question that prior to about 1963 the U discriminated against prac-

tically everybody except relatives of existing members and, of course, "everybody" includes N's. There is no question that U discriminated against N's up until the effective date of the Civil Rights Act of 1964. Evidence of ante-Act discrimination back to 1960 was admitted in this case for consideration solely in this connection—discrimination subsequent or a pattern or practice subsequent involves not only objective acts, but it involves the subjective. Pre-Act activity is considered only as so limited.

3. Prior to July, 1963, no N was ever tested for journeyman membership in U. Between 1961 and 1963, four N's had filed applications for journeyman membership.

4. W electricians who filed membership applications in and about 1961 were examined and initiated into the U. Henderson, an N, applied in July, 1961. His name is circled in the Minutes of the Executive Board of U. Such circling is unique. A special test for N's was administered by U in mid-1963. Although U had been administering regular examinations for membership during the first six months of 1963 to W applicants and although the applications of N's were then pending, the regular [5] examinations were not administered to the N's. In July of 1963, applications were on hand from six N's. Only four were invited to take the special exam for N's. The notice of the exam which the U sent to the four N's stated that it would be held at a given time on "Monday, July 9, 1963." That was a non-existent time, since Monday fell on July 8 that year. Despite that "coincidence" three N's did show up at the appointed time on the 8th. One declined to take the test, stating he was interested only in an apprenticeship; the other two took the test and failed.

The U scheduled this special exam to gain, in accordance with its own minutes, "a talking point with civil rights groups" and, for the same purpose, encouraged one of the two N's to take the test who did not want to take it because he was interested only in apprenticeship training. One N who took the special exam was an electrical contractor and fully qualified by reason of experience in the trade for referral. He was not informed of the referral system, although at the time all members were employed. U refused to inform him of his grade, even though U knew his grade and never has informed him of his grade.

5. None of the 18 N's were ever informed by U of the referral system. One learned about it since this lawsuit was filed and his information came from a contractor and not from the U.

6. Between the effective date of the Civil Rights Act and the time these complaints were filed, seven N's applied for membership. None of them was informed of the referral system. None of them was informed that he would not be examined for membership until and unless he was working in the trade for a union contractor. All were simply informed that they would be notified when they were to be examined. These failures were part and parcel of a pattern or practice of discrimination and were in fact discrimination designed, initially, to deprive the N's of employment opportunity, and secondly, union membership.

Of the seven, one was a non-resident of the territorial jurisdiction. His application was taken pursuant to the same pattern or design and, in addition, he was not informed that unless he lived in the geographical jurisdiction or worked in the trade in the jurisdiction, he would never be considered either for examinations or membership. (Todd)

One (Sharpe) who had in fact been a bona fide dues paying member of an IBEW local in Connecticut and who so informed U, was (a) not informed of category 2 on the technical "coincidence" that he did not have his card, and/or may not have cleared the post; (b) not informed of the referral system. At or about the same time non-union electricians coming into the geographical area

---

5. speaking, not of the questions, but otherwise

from even farther away were readily referred under the referral system—being W.

No regular union membership examination has ever been administered to any of the seven, nor did the U make any effort to inform them even of the July, 1967, membership exam.

7. Prior to the filing of this lawsuit, no N ever worked in a journeyman capacity under the auspices of (member, referral, or 48-hour man) U.

8. Since July 2, 1965, to the date of trial, 27 N's have had contact with or have been contacted by the U in one manner or another. Here is the classification:

a) Seven of them had filed with the U their signed formal applications for membership, which were pending at the time of the competency exam (which will be described hereinafter) in March of 1966. These seven, some of whom had filed before July 2, 1965, and some after, were and each of them was formally notified by the U in 1966 of the competency exam. Each of them got the notice. None of them took the competency exam. The names of these seven are: Anderson Dobbins, Joe Kennedy, William Andrews, David Brown, Bill Harden, Charles Letcher, and Paul Glenn. Each of them lived within the territorial jurisdiction of the U. Each of them was of journeyman age. More will be said of each of them in the next fact finding.

b) One who applied for membership in October, 1965, lived outside of the territorial jurisdiction of the U. There is no showing on the record that he was engaged in the trade within the territorial jurisdiction. This alternative qualification for membership set forth in the International Constitution is a reasonable requirement, and in respect of this individual, Ronald C. Todd, we do not find any discrimination.

c) One who applied on July 20, 1966, indicated in his application that he had been a member of an IBEW local in Groton, Connecticut. He was in fact such. He was in fact qualified for a class 2 referral. His application was at a time when U was unable to fill the request of contractors and 48-hour men were being hired. Historically U was in the habit of operating on an "honor system" (see Williams' testimony) even in respect of class 3 referrals. U did not refer Sharpe. The apprentice age excuse has nothing to do with it. He was discriminated against because of color and race. His name is William H. Sharpe.

d) Five N's had applied for membership prior to the time the competency exam was given in 1966. The U made a bona fide effort by registered mail on March 5, 1966, to notify these five of the competency exam. The registered notices came back indicating that these five had moved. There were no forwarding addresses. We find as a fact that these five failed to keep the U informed of their whereabouts and whatever the merits or demerits of the competency exam, their disappearance is a complete answer to any claim of discrimination as to them. U was under no duty to search for them. An applicant for membership is under a duty of keeping the "club" informed of his whereabouts. There was no [6] discrimination in respect of these five, to-wit: Louis Wilkinson, Robert Livingston, Irvin Dean, Henry A. Robinson, and Edward E. Chalk.

e) Milton Howard, an N, had been a member of an IBEW local in Middletown, Ohio. In March of 1968, he was referred by U as a category 2 man. This was months after this case was pending and was in response to an open request for an N electrician from a union contractor. We find nothing plus or minus either in respect of the plaintiffs or the defendant in the Howard situation. U had no alternative.

f) Wilson came into contact with U by virtue of his being "qualified for employment" by a union contractor several months after this case was pending, and in August or September of 1967. U had

---

6. effective, as distinguished from theoretical

been unable to fill the union contractor's request for journeymen and the contractor was desperate in more ways than one. On a Saturday Wilson, who had been recommended by an N contractor, Price, to the union contractor, Morgan, went to one of Morgan's jobs and on that day Morgan and Wilson worked together. Their work extended over a few hours. From observation during this two-hour period, Morgan concluded that Wilson was qualified. We do find as a result of such facts as this one and many other references in this record (See, for example, the testimony of the former business agent of U, Williams, to the effect that "the real test is working to the satisfaction of a union contractor.")[7] that in approximately a day's work "on the job" it can be determined whether a given individual is competent to work as a journeyman electrician (be it refined into lineman or wireman, or what have you) in the trade in the Cincinnati area. On the following Monday or Tuesday, Morgan and his partner were "called on the carpet" by the U. We do find that this was attributable to Wilson's color and not to the fact that "Morgan had been working with the tools." He had been doing that for some time. Wilson is working in the trade today, not by reason of any affirmative action of U, but because a union contractor (a second one) wanted him, found him as the result of independent action, and there was nothing much U could do about it as a practical matter. Wilson is in fact a competent journeyman electrician. He has not been discriminated against.

g) Two of them, Willie Bobbs and Edward Ward, worked as summer helpers for a union contractor (one for just a couple of days). They did so with the permission of the U, given after this lawsuit was pending. The initiative in respect of their employment came from the contractor who was a witness in this case and who is obviously an affirmative action person, since his efforts in the area extend to the clerical, as well as to the craft. As a matter of fact, the employment of one was due to the initial intervention of a "cleric." On the issue of pattern or practice, we attach a little, but not much, weight to this from U's point of view.

h) Three groundsmen have worked in the trade. Two of them (and possibly all three) have been employed by the contractor just mentioned above. The three have worked with the permission of U. As has heretofore been pointed out, a groundsman, while working in the trade, is not "of the craft;" he is a laborer. The same little, if any, weight is given.

i) Charles Long applied in August of 1965, at the age of 19. His application indicated present employment in the trade for a non-union electrical contractor. However, he later applied for the competency test and evidently he had never actually been employed by the contractor mentioned on his membership application and his experience in the trade was solely as a "helper." Because of his age, he was referred to the JATC at the time of the competency exam and was informed fully of how to start applying. He did not follow that up. We find no discrimination in respect of Mr. Long.

j) One, Frank Sawyer, applied for the competency exam in 1966. His age was 26. His application showed on its face that he was a veteran, and showed on its face that he wanted to start as an apprentice. He took the competency exam and after it, the JATC and the U (since in Ohio as a matter of basic substantive law, a person acting as a member of one committee and the representative of another entity, the U, on that committee cannot forget when he acts in one capacity what he learned in the other) were specifically informed that he was a veteran—and with the four years' age credit given veterans, he was eligible for the apprentice program. Neither the U nor the JATC informed Sawyer in his personal interview of either of these things: (1) when the next applications would be

---

7. as well as the testimony of the present B.A. (R. 2409–10) a contractor "on the

job test" for qualification is brief and determinative as a "practical" matter,

taken for the apprentice program, or (2) how to apply. Sawyer was in fact a veteran and it is so found. He had demonstrated by steady employment with the same employer and by the successful pursuit of specialized courses in night schools that he possessed the aptitude and qualifications necessary to be an able apprentice. If he had been W, he would have been treated differently and it is found that he was discriminated against both by the JATC and the U in March of 1966 by reason of his race and color.

k) While Roy Roberts, in either 1965 or 1966, or possibly both, went into the building which houses U's office, the evidence in the record relating to the question of whether he established contact with U or some other union preponderates in favor of the latter. There was no discrimination by U in respect of Roberts.

l) Walter L. Walters, Lee Scott, and Willie Slaughter are presently in the JATC apprentice program as the result of their own competitive effort in the circumstances described hereinafter.

9. Carrying forward the facts with respect to category (a) in the previous numbered finding of fact—Paul Glenn did not testify at the trial of this case, nor are we otherwise informed regarding Mr. Glenn, except that he was, at the time of his application, a porter in a drug store without any previous experience in the trade. We find no discrimination in respect of Mr. Glenn.

Charles Letcher's application was before July 2, 1965. It was continuing. By education, experience, and training, he was, at the time of his application and on July 2, 1965, and in March of 1966, a competent electrician eligible for referral under the U's referral system. The U effort, after the effective date of the Act, to steer him into a competency exam rather than to refer him to a union contractor was discriminatory by reason of his race and color.

William S. Andrews applied for membership in August of 1965. At that time by reason of his experience in the trade and education, he was fully qualified for referral. The failure to refer him or place him on the referral list at the time of his application was discriminatory and the U effort to steer him into a competency examination rather than to refer him to a union contractor was also discriminatory.

David A. Brown applied on August 13, 1965. As with the previous individual, he had worked and was working in the trade and by reason of education and experience he was competent for referral. The same findings of discrimination are made.

William Harden applied in August of 1965. His application indicated that he was self-employed as a journeyman. The failure of U to inform him as of the time of his application that under the U rules a contractor could not be a member of a local was discriminatory. The same additional findings of discrimination are made as above.

Joe Kennedy applied for membership in August, 1965. His application did not indicate any present or previous experience in the trade. He was not a witness in this case and we are not otherwise informed. Based on the evidence in this case, there is no showing that Kennedy was discriminated against.

Anderson Dobbins, the plaintiff in one of these consolidated cases, applied on September 14, 1965. His application did not indicate any previous experience in the trade. (We omit pre-Act applications as unnecessary for any determinations in respect of Dobbins.) In fact Dobbins was highly and directionally educated, both high school-wise and college-wise. Without detail, it can be said conclusorily that the difficulty with that part of the Dobbins action which purports to be a class action is that, on this record, he is in a class by himself at least from an educational point of view. He served two tours of duty with the United States armed services, and was honorably discharged. He attempted during the 50's and 60's to obtain employment commen-

surate with his education in the electrical field as a journeyman, but was unable to do so and, as a consequence, worked in various capacities with the City of Cincinnati and the Post Office Department.

At least for some years prior to the time of his application for membership with the U and some years prior to the trial of this case, he was and is an independent non-union electrical contractor in the dwelling field. He has passed at least one journeyman's test administered by a municipal government. His direct testimony in relation to his performance of many jobs in this area which are subject to "municipal" [8] inspection and which have passed municipal inspection is uncontradicted. A feeble effort along these lines terminated in a manner which lends credence to his testimony.

We have no hesitancy in finding that in September of 1965 he was, by any test, thoroughly eligible for referral and U's failure to include his name on the referral books and/or failure to refer him, and/or effort to direct him into a competency exam, each is found to have been discriminatory by reason of race or color. We further find as a fact that the failure of the U to extend to Dobbins, Letcher, Andrews, Brown and Harden the opportunity of taking the membership exam in 1967 (more will be said about this later) was similarly discriminatory and the reason therefor arbitrary.

■ Two more matters in respect of Dobbins— in 1963 he was arrested in the City of Cincinnati and convicted of a misdemeanor, petit larceny, for which he was fined $25.00. There, of course, is no question of the relevancy of this since Dobbins was a witness—the relevancy being in connection with impeachment or credibility. See Smith v. United States, 283 F.2d 16, 87 A.L.R.2d 394 (6th, 1960); Henderson v. United States, 202 F.2d 400 (6th, 1953); Pearson v. United States, 192 F.2d 681 (6th, 1951). As a result of this conviction and a failure to pay (as distinguished from failure to report) a $30.00 Cincinnati Income Tax, he lost his

job by reason of discharge from the Post Office.

■ The U in this connection takes the position that one or more of the following facts furnishes an adequate reason for the U's failure to refer or admit to membership:

a) The conviction on the misdemeanor.

b) The discharge from the Post Office.

c) The Cincinnati Income Tax item.

d) The immediate filing by Dobbins of a discriminatory complaint with the Ohio Civil Rights Commission (September 15, 1965—which was dealt with adversely to him by the Ohio Commission).

e) In December of 1965, Dobbins made a national broadcast on CBS, which was highly critical of U's alleged discriminatory practices.

The $30.00 reason is no reason at all. Title 7, itself, (42 U.S.C. § 2000e–3) disposes of the quickness of the charge and, ipso facto, the broadcast. There is no evidence in this record that the U ever concerned itself with any employment of an applicant other than his present employment—let alone concerned itself with the reason for past terminations. The U both affirmatively and negatively on this record has indicated the type of criminal activity it is interested in. The competency exam application indicated that it was interested only in "Landrum-Griffin" crimes—and it named them. It expressed interest in grand larceny—it studiously omitted petit. See P.X. 10. And, finally, the complete arbitrariness of this grasp at coincidence is forcefully demonstrated in a small part of this record. Frank Sawyer, in his application "for referral only" for the competency exam, thought the U might be interested in petit larceny, so he added this comment following the Landrum question: "In 1951, in Montgomery, Alabama, I took some candy from a train." The JATC (50% U) took his $25.00 and gave him the competency

---

8. via private contract

exam. It is in fact an extreme type of arbitrariness to differentiate between two petit larcenies—the word "petit" is apt description.

We find as a fact that, by any standard, Dobbins is eligible for membership or referral and has been since September of 1965, and that the only obstacle to either or both has been the discrimination of U by reason of his race and color.

## Section IV.

### Union Examinations

1. There is published and has been for some years a National Electrical Code. It is the product of knowledge and recommendations of electrical manufacturers and electrical contractors and, most importantly, fire underwriters. In most places in the country, it is read into building codes. It, therefore, generally speaking, has the force of law. It is published in various forms, and while the bound volume can get rather expensive, electrical suppliers will furnish it free of cost in a pamphlet form and in that form it is something a workman could carry in a tool box or in his pocket. For practical purposes, it sets forth the answers to questions properly posed for qualifying an electrician. In one or two, or three or four years, working in the trade, an apprentice or an electrician will come in contact with this, that or the other thing frequently enough that he has it in his head as a matter of job information. Then there are some other more specialized items which a workman might not be expected to have in his head even after four years in the trade, but he would be expected to know how to find the answer and apply the answer from the code. Then there are some still more specialized things which may or may not be ultimately answered in the code—they generally are—which would come under the heading of "advanced information." As a general proposition, the answers to proper examination questions are in the code and anyone who knew the code could pass the exams. Of course, that would not make him a practical electrician in any sense and, as this record indicates, a person can be a competent journeyman electrician, demonstrably, and not even begin to pass a fair code examination.

2. Generally speaking, a fair qualification exam, whether for union membership or municipal licensing, would be topheavy with the type of questions that one working in the trade either carried around in his head or could cursorily answer by a quick reference to the code.

3. Prior to 1963, the U's examinations, whether fair or not, were necessarily discriminatory, since there is no question that prior to that time U was a guild operation and relatives were preferred.

4. In 1963 the Federal Government began construction or was in the process of construction of a huge new downtown Federal Building in Cincinnati. At or about the same time, the NAACP initiated public pressure for the employment of N's in the craft occupations generally and specifically with relation to this building, and the City of Cincinnati Mayor's Friendly Relations Committee initiated public pressures along the same lines. At least seven of the first eight formal applications for membership by N's to U were made in 1963. During the same year U administered, at intervals having no relationship to the intervals heretofore referred to, membership examinations to some 80 or more W applicants. This record does not indicate how many passed. It does indicate that previous passing was not necessarily followed by membership. In any event, 40 W's were admitted to membership at or about that time.

The purpose of this mass examining is not clear in this record. The plaintiff's position is that the purpose was to "load up the union with W members." A member of the U Examining Board indicated that due to the unemployment in the trade and the employment by the contractors of some non-union members, the U and the union contractors arrived

at some understanding which involved giving mass examinations for the purpose of "weeding out" some of these persons who were employed. In any event, whatever may be the answer, the conclusion is that the mass examinations were administered for purposes other than the proper purpose as stated in the International Constitution and the U by-laws and the Collective Bargaining Agreement, i. e., to determine qualification for admission.

5. In July of 1963, as we have previously noted, a special journeyman examination for N's only was held. Concededly, it was the result of pressure from civil rights groups, including the Mayor's Friendly Relations Committee and again it was for at least one purpose other than a proper purpose, being to-wit, "to obtain a good talking point for future meetings" with the civil rights organizations. It was so stated on the U's minutes. This was the first and the last time that U ever administered "our examination" to any person not then employed in the trade for a union contractor; or stated otherwise, it was the first and only time that U ever administered a membership exam to anyone who had not previously had the substantial benefit of the U's referral system, whether the initiative in the referral came from a union contractor or the U. The exam questions were objectively fair and the N's who took the examination failed, and their papers were objectively fairly graded.

6. Beginning in 1964 and extending through 1965, 1966, and up to July, 1967, U did not administer any membership examination. The failure to do so was attributable to discrimination by reason of the pending applications for membership of N's.

7. In 1965, the Ohio Civil Rights Commission commenced a searching investigation into allegations of discrimination in the building trades industry in the Cincinnati area. This was at the request of the Cincinnati City Council. The investigation and the reporting of the investigation by the Commission were official actions enjoined upon the Commission by Revised Code of Ohio § 4112.01 et seq. The skilled crafts investigated included, not only the electrician field, but a number of others, such as the masons, carpenters, iron workers, painters, plasterers, and plumbers, etc. While the investigating and reporting was the official business of a duly constituted state agency, and was competent evidence and admitted as such (28 U.S.C. § 1732, Bridger v. Union Rwy. Co., 355 F.2d 382 (6th, 1966); DePinto v. Provident, 374 F.2d 37 (9th, 1967)) we do not, in arriving at any finding of fact herein, take into consideration anything in connection with Plaintiff's Exhibit XX other than what has been stated immediately hereinabove in this number, and the fact that the report was publicly announced in late February, 1966, and the fact that the competency examination of U was announced the day before.

8. At that time the pressures directed by the NAACP and CORE and the Mayor's Friendly Relations Committee and the N applicants, not only in U but in the other building trades unions, were for *"membership."* At least, insofar as this U is concerned, and probably all the rest of them, a sine quà non condition precedent of "membership" was "work in the trade under the jurisdiction of the union." It cannot be determined and it is not determined that such a condition precedent was unreasonable. It certainly is not unreasonable in the company of a referral system working without discrimination. This next finding is stated with reluctance, but is forced by this record—the pressurers and the pressurees never got on the same wave length. The U studiously refrained from explaining referral to the pressurers and the pressurers simply refrained from trying to learn anything about it, and the evidence in this record forces that almost unbelievable conclusion.

It is determined that there was nothing basically discriminatory about the idea of a competency exam—with the

single exception we have noted, this U—and probably the rest of them—were faced for the first time with demands for "membership" without "in the union trade" experience—or—"referral" on what might have been a mass scale—and nobody then knew.

9. In any event, a "competency" exam was scheduled and announced. From start to finish it was a comedy of errors. The U, the media, and the pressurers jumbled "journeyman" and "member" and "referral" to such an extent (whether accidentally or purposely) that a student of the matter would have had trouble answering the question: What was the competency exam? To take a few instances—it was administered by the JATC under a caption entitled, "Joint Competency Board," which it has never been before or since, on this record. Secondly, while the application as finally prepared made it as plain as plain could be that it was for referral and not for membership, a referral system was described which never has been in existence in the area. That came about in this way—the Collective Bargaining Contract had expired in 1965, and the U and NECA had negotiated and some time in January of 1966 had agreed on a new contract which was, of course, subject to the approval of the International IBEW in Washington. The so-negotiated conditional contract contained a new referral system. Instead of four categories, it had only two, and those dealt only with "qualified workers;" and further dealt only with the "building and construction trade;" neither of which words, i. e., the new ones, ever appeared in an existing referral system and each of which words were more restrictive insofar as N's were concerned. For instance, a "qualified worker"—and you could not even get on the referral list unless you were a qualified worker—had to have four years' experience in the inside electrical trade in the building and construction industry. Furthermore, a "qualified worker" had to have passed either an IBEW exam, or a competency exam given by a JATC, or a JATC apprentice exam. There were then two groups of qualified workers. In Group 1 were those who had worked a half year for each of the preceding four years or more for union contractors. In Group 2 you put everybody else. The negotiation of this new conditional referral system was obviously discriminatory in and of itself. The description of it in the notices and applications for the competency exam was a part of a pattern of discrimination. It was intended to and did "chill." By some strange "coincidence," the International Union, which had received the conditional contract in early January of 1966, during the Ohio Civil Rights Commission investigation, acted on it on March 2, 1966, by letter received at the office of the International's representative in Cincinnati on Victory Parkway, on March 4, 1966. The International ruled thus: "The so-called referral procedure will not be approved. The Local Union is directed to insert the standard referral procedure. * * *" The letters to the applicants for the competency exam (being persons referred by the Ohio Civil Rights Commission and persons having applications for union membership on file) were mailed on Saturday, March 5, 1966. At no time prior to the competency exam did U make any effort to inform anybody that the overly restrictive referral system described in its letters of March 5 was not ever in effect. It is also noted that in its notice to the prospective takers of the competency exam, the Competency Board refrained from informing the recipients that under the Collective Bargaining Agreement a referred worker who worked for a union contractor for 30 days or more was in a position in which, at least as a matter of contract, he just might become a union member.

Another contribution to the comedy—while it was made quite plain at the bitter end that the examination was for referral only, some 55 persons finally took it; 42 were then and had for some time been working on referrals for union contractors. None of them had a thing

to gain since he already had a referral job. All of them flunked. None of them lost his job as the result of demonstrating his "incompetency." Each of them paid $25.00 for the privilege and the only possible effect that it could ever have had on any one of them would have been under the non-existent referral system—which U knew to be non-existent for at least three weeks prior to the time the examination was held.

Another contribution to the comedy, the examination cost of $25.00 was stated to cover a written test and a practical test, and the materials necessary for the latter. No practical test was ever given anybody, nor was any partial refund of the $25.00 ever made to anybody.

10. It is found that as a matter of reasonable *theory*, the competency test, as was the 1963 special N test, was objectively fair and it was objectively fairly graded. They were very much alike. One of them was clearly administered for membership purposes. It is, therefore, determined that the tests as administered have no relationship to competency or qualification to work in the trade in U's geographical area, since the 44 who failed—and some dismally—were successfully employed, and had been for years, for major union contractors specializing in the building and construction areas.

11. No N took the competency test except Sawyer. No one was advised that the taking or failure to take the competency exam would have anything to do with union membership. It is determined that for a person interested in membership, the conclusion not to take the competency exam was reasonable and correct.

12. On July 26, 1967, U administered its first general membership examination since 1963. U decided that the exam would be given only to those having ap-

plications pending at and prior to the time the competency exam was given on March 30, 1966, and who had taken the competency examination. It excluded persons who had applied since March 30, 1966, and those who had applied prior to March 30, 1966, who failed to take the competency exam. That determination was an act in furtherance of a pattern of discrimination. It was intended to and did exclude the N's named in Finding No. 8–a of Section III above, being seven in number. The stated reason for excluding those who failed to take the competency exam was that their failure showed a "lack of interest" and the membership applications were considered "inactive." A diametric position was taken during the proceedings before this Court, during which the U stated that these applications were even now "current and active." [9]

13. The 1967 journeyman's examination was discriminatory under Title 7 in another respect. That examination was taken by 44 electricians (all W). Three passed, 41 failed. Each of the three who passed had failed the 1966 competency exam. In 1967, their grades were, respectively, 98, 93, and 85. They did twice as well in 1967 as in 1966. Practically everybody else did about half as well in 1967 as in 1966. And with reason. U's nationally known expert described the 1967 exam as "unfair" and "a mistake." In the 1967 exam, 56% of the questions related to specialized information that electricians working at the trade would not be required to know and most of the questions were, by the design of the National JATC, intended for submission to fourth year apprentices in school. It is here determined that the purpose of the 1967 journeyman exam was to establish a flunk rate which would deter N's from further membership persistence; or stated otherwise, it was designed to "chill." [10] And it was a

---

9. Somewhat related, there is some evidence in this record that shortly before the trial started, U offered to refer Dobbins. We have not considered that evidence in any way, since it seems reasonable to conclude that the time honored irrelevancy of settlement negotiations survives Title 7.

10. A not unusual feature of "denial" or "discriminatory" action—Cameron v. John-

part of a pattern of discrimination. We leave to conjecture the explanation of the three "Einsteins."

14. Shortly before the trial of this case was scheduled to commence, U scheduled a 1968 journeyman examination which became the object in this case of an All Writs Injunction. During the trial, U's B.A. testified that the "only way for Negroes, as well as Whites" to attain membership in the U today is "through the JATC." (2468)

Our conclusion, and this, of course, for decree purposes, is that there is no relationship between the examinations as administered by U and "the determination of the qualifications for the trade" of electricians.[11]

15. The fair test of an individual's qualifications to work in the electrician trade in this geographical area is actual ability to work on the job in the trade for the average contractor operating in the trade. Many persons have been "so qualified" without difficulty. In addition, and within this geographical area, the Northern Kentucky Electric Authority, a Committee formed with the approval of the Fiscal Courts of Campbell and Kenton Counties based upon legislation enacted by the Legislature of the Commonwealth of Kentucky, is composed of a union electrical contractor, a non-union electrical contractor, an electrical engineer, an architect, a fire official of each of Covington and Newport, a utility man, and an insurance adjuster. This Committee administers objectively fair tests for licensing electricians, both theoretically and practically.

16. Individuals should not be permitted to work in the trade of an electrician without some previous qualification, examination-wise or practical-wise. If for no other reason, this is implied in 29 U.S.C. § 158(f) (3) in a situation involving a hiring hall. Ideally the determination should be made by the U. In

fact, electricians work in an occupation which, not only as a matter of common knowledge, but also on this record, is specifically related to danger and safety. Electricity is a dangerous thing, particularly if it or anything connected with it is handled by an incompetent, not only in the human field of life or injury, or death, but also in the property field, via fire.

### Section V.

### Some Additional Facts About the Referral System

1. Through its referral system and the Collective Bargaining Contract and the hiring hall arrangement referred to in the latter, the U effectively controls who will work for union contractors within its jurisdiction.

2. The referral system, with its exclusive hiring hall and priority referral classifications is sanctioned by 29 U.S.C. § 158, under which a labor organization in the building and construction industry is excepted from subsections (a) and (b) of that section and permitted to, as a matter of contract, obtain the exclusive opportunity to refer qualified applicants for employment in the particular trade and to obtain, as a portion of a collective bargaining agreement, the specification of minimum training or experience qualifications and also in that manner provide for priority in opportunities for employment based upon length of service with employers in the particular industry in the particular geographical area. The hiring hall agreement and exclusive employment agreement, and the qualification specifications therein, as well as the group differentiations, were adopted as a result of collective bargaining at least by 1958, if not before. They were not adopted as an item in any practice of racial discrimination. Insofar as Title 7 is concerned, these provisions are not, per se,

---

son, 390 U.S. 611, at 619, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968); Dombrowski v. Pfister, 380 U.S. 479, at 487, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); Keyishian

v. Board of Regents, 385 U.S. 589, at 604, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).

11. This, from a *practical* point of view.

discriminatory. They are reasonably related to the fundamental obligations of the labor union, which are to provide maximum bargaining power and, through it, the employment of its members for the maximum possible time, at the maximum possible wage. Any de facto discrimination with respect to color or race occurring by reason of these provisions in the Collective Bargaining Agreement, to the extent that any such occurred subsequent to July 2, 1965, is due, in the relationship of cause and effect, to discrimination ante-July 2, 1965, except to the extent that acts subsequent, constituting discrimination, have prevented certain individuals heretofore dealt with in these findings from accumulating "time credit for work in the trade" [12] for present or future referral. This latter is correctable by decree.

3. Basic to this case is, of course, the question whether there have been or are qualified N's in the area, that is to say, N's who by reason of education or experience in the electrical trade, or both, are qualified by any fair test. As is any court, we are governed by this record. We have dealt by name above with 27 and have found certain competent in fact and have found it unnecessary to decide whether certain others named are or are not. Certain others testified in this case. Again, it is not necessary with respect to those others to pass on the question, since two, obviously qualified, are employers and not prospective employees. Hence, the fact of the matter is that the names of practically all appear in the record and have been disposed of.

Two things force us to the conclusion that there have not been in fact in this geographical area any appreciable number of N's competent to perform as journeymen electricians. We have alluded to one at the very outset, i. e., the fact that one N, and one only, in March, 1968, appeared in response to a good faith and well broadcast request for such.

The second is this—the dedicated (as such persons must be) Chairman of the Cincinnati Human Relations Commission (the successor to the Mayor's Friendly Relations Committee) in April, 1966, endeavored to set up the J.U.M.P. Program, and addressed the Department of Labor of the United States Government as follows:

"As of the present, there seems to be a consensus of opinion, shared by union officials, contractors, spokesmen for the civil rights groups, the city administration, and other informed persons that there does not exist in the City of Cincinnati a significant number of Negroes who have the present training and ability to perform skilled jobs in the various building trades. It is also a consensus that jobs are now, and for quite some time in the future will continue to be, available to skilled Negroes in this area. It is also a consensus that there is a real need to train and upgrade a sufficient number of Negroes to qualify them for work in the various building trades. There is general agreement that the first step toward such a training program is an intensive recruitment program, etc. * * * "

The J.U.M.P. Program was set up in 1966. It failed. The accent in fact since then has been in connection with P.R. E.P., dealing with youths—meaning this: the lack of a significant number of adults in 1966, etc. remained a lack.

3–A. No N has ever been informed by the U of the existence of the referral system prior to August, 1967, nor has any N ever been shown a referral book prior to that time, or been permitted to sign such, although a number of N's have gone to the U office. Hundreds of W's have been informed of the referral system since July 2, 1965, and have been referred out. Some of the N's had considerably more experience and qualification than some of the W's.

12. including work for a union contractor and credit for passing of a Union exam for membership

4. The referral system as written provides no guidelines for its actual application. For instance, there is no guideline for how someone determines whether someone is "qualified." As a result, three different systems have been used in the past seven or eight years and two of them since July, 1965. Under one system the B.A. asked someone who came in and took his word for it and sent him out to a contractor where the real test of his qualifications was made. The exact detail of a second system is difficult to describe from this record, although everyone agrees it was different. In the third system, the one recently in effect, the B.A. applies to some extent some questioning practices he adopted while working as a representative of an employer and, then again, depends on the actual work with the contractor to some extent. In actual practice, therefore, the referral system is applied arbitrarily at the particular whim of the B.A., and one of the B.A.'s who testified indicated that it was his "prerogative" to adjust it by whim. As applied, the whim has been discriminatory. At least one N who, on questioning, demonstrated actual and ample experience was not referred as W's were under any of the three systems. The referral system as presently written is in fact deficient and continues a dangerous potential in the discrimination field. For decree purposes, it is noted that some definitive implementation is required to the end that the system, in operation, working in accordance therewith, may be the subject of some examination which would fairly answer whether there has or there has not been discrimination.

## Section VI.

### The JATC

1. Applicants for the program who are accepted enter into a formal contract with the JATC, undertaking, among other things, to extend their best efforts to complete the program. The program is a four-year one. It involves a special evening course of study, two evenings a week during the normal school year, at Courter Tech. High School in Cincinnati. Successful completion of the school program is required. The JATC agrees to use its best efforts to obtain the apprentice 2,000 hours (50 weeks at 40 hours) of employment per year as an apprentice with a union contractor. The wage during the first six months is 40% of the journeyman's wage and it escalates to 45% the second six months, 50% the second year, 60% the third, and 75% the fourth. Upon successful completion, the apprentice becomes a journeyman member of U.

2. The JATC determines each year how many apprentices to accept into the first year of the program. In each of the years 1965 through this present year, the number decided upon has been 40. The high 40 from among the applicants are determined by a testing procedure hereinafter outlined and, in addition, the same procedure determines who the alternates will be—three to five alternates are selected, being the next three or five high following the 40—and occasionally one or the other of these alternates actually gets into the program for the usual various reasons.

3. In 1937, Congress passed 29 U.S.C. § 50, authorizing and directing the Secretary of Labor to formulate and promote the furtherance of labor standards necessary to safeguard the welfare of apprentices, and further authorized and directed the Secretary of Labor to bring together employers and labor for the formulation of programs of apprenticeship, to cooperate with state agencies engaged in the formulation of such standards. He was also authorized by 50–a to publish information relating to existing and proposed labor standards of apprenticeship, and he was further authorized to appoint national advisory committees to serve without compensation.

4. Under the Davis Bacon Act, 40 U.S.C. § 276a and following, the Secretary of Labor is authorized to determine minimum wages to be paid various classes of laborers and mechanics in

government construction contracts. By regulation, 29 C.F.R. 5.5(a) (4), the Secretary has determined that a government contractor may employ apprentices as such (which class has minimum wage rates that are less than the journeyman classification) only when they are registered, individually, under a bona fide apprenticeship program registered with the Bureau of Apprenticeship and Training of the United States Department of Labor.

Of course, the effect is to make lower costs possible for a contractor on government projects by allowing him to pay some of his employees at apprentice rates.

5. In 1963, the Secretary of Labor determined under 29 U.S.C. § 50 to adopt and publish regulations "reading in" to the JATC apprentice approval program regulations designed to "promote equality of opportunity in apprenticeship and training programs registered with the Bureau of Apprenticeship and Training." These regulations are elaborate. They were published in December of 1963 in the Federal Register and are generally referred to as "Part 30" (29 C.F.R. Part 30, entitled, "Nondiscrimination in Apprenticeship Training.") Part 30 deals at length with selection of apprentices. The guidelines are that the selection must be on the basis of qualification alone. Examples of standards by which comparative qualifications may be determined include fair aptitude tests, school diplomas, age requirements, fair interviews, school grades, etc. "Objective standards" is defined to mean that qualifications and eligibility must be determined by specific requirements so that questions of discrimination in selection can be fairly adjudicated. Chapter 30, or Part 30, requires the inclusion in any JATC plan statements in substance that selection of apprentices shall be made from qualified applicants on the basis of qualification alone and without regard to race, color, etc. Part 30 required, for practical purposes, a re-registration of any theretofore approved JATC plan so as to insure at least literal compliance.

BAT was given the job of examining the new plans as submitted and it was also required to "conduct a systematic field review of existing federally registered programs * * * and take appropriate action regarding programs which do not adopt and operate in accordance with Chapter 30 standards." It required periodic field reviews. The field reviews were directed to include a review for equal opportunity purposes and the regulations set forth a check list for that purpose. The chapter required a forwarding by a local BAT office of its field review file to the regional office of BAT and further provided for an appellate administrative procedure.

6. In 1963 and somewhat in anticipation of Part 30 (which the Cincinnati JATC was familiar with through the National) the Cincinnati JATC adopted formal and comprehensive written standards of local apprenticeship and training for the electrical contracting industry. These standards were registered with BAT in 1965 and were approved not only by the local office of BAT, but also by the regional and national office, as well as by the Ohio State Apprenticeship Council. Basically, although there have been revisions, the procedures described in that registration are in effect today. A copy appears in the record as P.X. 27.

Qualifications are age (18 to 24—with a credit for military service temporalwise), graduation from a high school, and physical fitness. The selection procedure is described in a six-page writing filed with and approved by BAT in 1965. There is a requirement for the furnishing of a high school transcript, of an interview and, what is important in the interview, what matters will be taken into consideration in evaluating education, etc. As filed, the selection procedure indicates that any particular applicant may receive up to 100 points and that the necessary number of applicants will qualify in the rotation of point accomplishment. Of the 100 points, 28 relate to education, 60 to aptitude testing, and 12 to the oral interview.

In the education area, involving the maximum of 28 points, up to 10 may be earned for class rank and up to 18 may be earned for specifics, such as an algebra course, up to 3; mechanical drawing, up to 3; trigonometry, up to 3; related science, up to 3; and attendance and promptness, up to 3.

In the testing area in which an applicant can earn up to 60 the procedure indicates that one who receives A+ will receive 60 points, and this goes down to one who receives a D will get 39 points. There are specific points related to A, B, C, D plus, but not to A, B, C, D minus, and the aptitude tester has assigned those grades to some apprentices, which has caused some difficulty.

In the oral interview area, with a maximum of 12 points, the important factors are stated as six, being interest, appearance, ambition, physical potential, personality, and attitude.

7. The standards as written have been examined from a fact finding point of view *de novo*. These standards selection-wise and otherwise are not arbitrary, are reasonably related to the Congressional intent of Section 50, as well as Title VII, and they are in no way discriminatory. The same is true of the educational program.

8. In 1965 (i. e., for the 1965 starting class) there were 108 applicants for the program; 40 were accepted. Nine of the applicants were N and none of them were accepted.

In 1966 there were 115 applicants for the program; 40 were accepted. Nine of the applicants were N and one of them was accepted.

In 1967 there were 171 applicants; 40 were accepted. Of the applicants five were N and two were accepted. The number of applicants for the 1968 class was about 185. There will be 40 accepted. The aptitude tests have been administered to them. Of the applicants 16 were N's, nine of whom had received the first P.R.E.P. Program which was given in this area in the spring of 1968. Of these nine, four received A+ grades out of five given. Two received A grades out of five given. One received a B grade out of five given. Of the same nine, six are in the top eight, seven are in the top 24, eight are in the top 40, and all are in the top 62.

The P.R.E.P. Program is administered as a promotion and development project of the Citizens Committee on Youth (government financed) in cooperation with the JATC, the NAACP and the Urban League of Greater Cincinnati. It is designed to place a minimum of 50 boys per year into the various building trades apprenticeship programs, and is designed to furnish the affirmative action deemed to be required to transpose a youthful member of a minority to a competitive status in relation to the already defined apprenticeship standards in the various trades.

9. The JATC has recently (May, 1968) caused its standards to be amended so as to state on its face that G.E.D. (General Educational Development Test administered by the General Educational Development Testing Service, American Council on Education) will be accepted as the equivalent of a successful high school program. It has been in fact accepted before. There is no showing in this record of anything discriminatory related to G.E.D. While the plaintiff claims that the previous failure to inform those concerned of the G.E.D. acceptability was such, there is no indication in this record that the failure was or could have been discriminatory.

10. The JATC in applying its standard has interpreted the upper "24" age limit differently at various times. (For instance, under 25 at the time of application; under 25 at the time of testing; under 25 on October 1st of the year of entrance.) There is no showing that the changes in interpretation were in any way related to race or color. It is found that the variants are merely the commonplace with respect to such matters in all fields.

11. The defendant JATC has employed Professor Glen LaGrange, of the Psychology Department of Xavier Uni-

versity, of Cincinnati, Ohio, since 1961 to administer aptitude tests to apprentice applicants. He has done so each year since that time. There is no doubt that the tests which have been administered are fairly and reasonably related to the proper aptitudes, the tests themselves were properly selected (others could have been, but there is no showing that any should have been) and there is also no doubt in this record that the tests have been fairly and objectively administered and graded. As a matter of fact, there is no doubt in this record that the grader has not the slightest idea of the color or race of any particular student whose paper is being graded. The grades include a grade minus, such as A— (whereas none such are provided in the published and filed standards) which raised and could raise some problems. So far it has raised no problems related to discrimination. The variant is found to be simply concomitant with intellectual (or perhaps professorial is more apt) independence and the JATC had nothing to do with bringing about the variant.

12. Beginning with the year 1967, the JATC has hired Mr. James Kelly, of the Admissions Department of Xavier University, to evaluate the high school transcripts of applicants and award to each applicant the points that he (Mr. Kelly) based on his own judgment, concludes said applicant has earned thereby —the maximum being 28 points. Kelly is qualified by training and experience to evaluate and rank high school transcripts. This has been done by him fairly and his reported results and point assignments have been without any discrimination whatsoever.

13. In 1965, the JATC prescreened applicants before the aptitude test was given so as to eliminate therefrom those with low high school grades. Four N's were thereby rejected. The prescreening did not follow any objective standard. The four N's had better high school records than many of the W's who were tested. The prescreening was (in a great many instances affecting both W's and N's) arbitrary. In fact, W applicants submitting transcripts did have a better overall chance of surviving the prescreening than did N applicants.

14. In 1966, and particularly related to the ten points allocable for class rank, the actual allocations by the members of the JATC will not bear the mathematical test involved. The point awards by the various members were substantially arbitrary and inconsistent. The arbitrariness overall was favorable to the W candidates and unfavorable to the N's. No N was actually discriminated out as a result of this arbitrariness, although if the maximum arbitrariness favoring one W had been extended to one N, the N would have been admitted in the course. However, if the entire process had been mathematically letter perfect, the result would have been the same, that is to say, the imperfection did not result in discriminatory exclusion.

15. Again in 1967—and even with the benefit of the Kelly reports—the award of "extra points" in the education category over and above mathematical propriety in respect of rank (and the combination in education as covered in the Kelly reports) continued to favor the W's and disfavor the N's. The N candidates were given virtually the same number of points as Kelly recommended, while W candidates similarly situated were generally awarded extra points. However, with respect to 69 out of the 116 applicants, Kelly's report, in addition to simply reporting figures, bore some remarks. These remarks indicate that Kelly thought, with respect to those 69, that there was an area of discretion. Further, most of the extra points allowed were relatively insignificant. Again, while the award of these extra points did in fact affect the identities of applicants admitted, it was a matter of W vs. W; or, there was no actual discriminatory effect by reason of race or color. Stated otherwise, if everything had been mathematically letter perfect, there still would have been two and not three N's admitted to the program in 1967.

16. The oral interview portion of the qualification program, involving 12

points, was fairly administered by the JATC and its individual members during each of the years 1965, 1966 and 1967. In each of those years, on the oral interviews, N applicants scored at least as well as W applicants based on any form of scrutiny.

17. The prescreening process was eliminated after 1965.

18. The annual LaGrange reports on the results of the aptitude tests are in the form of a list in the numerical order of rank, accompanied by alphabetical grades. By and large, the JATC transposition of such into a numerical score has been generally fair and proper. There have been some inconsistencies in the sense that some one or more W's out of the list was preferred over some one or more N's, but there is no showing in the LaGrange area, involving the greatest number of points (a maximum of 60), that there was any discrimination in transposition of any import.

19. The LaGrange testing fee is $15.-00 per applicant. Since 1966 the applicant pays $10.00 of this and the JATC pays $5.00.

20. The JATC pays for the educational program at Courter High School and the books involved. The cost per apprentice in training is approximately $150 a year.

21. The members of the JATC devote a substantial part of their time to the program—the equivalent of some 20 days a year. This is not during working hours. The contractor members receive no compensation and the union members receive only a token. As this record demonstrates, complete and accurate records have been kept by JATC. The JATC expends approximately $20,000.00 a year on the training of apprentices and this money comes from the U and the contractors. Since 1963 it has done a good job in improving the quality of apprentices and it has prepared apprentices to meet the increasing challenge of the technological changes in the electrical construction industry. These high standards are, in fact, necessary and will be increasingly so because of the rapid technological changes in the industry. We note in passing that the explanation of "The National Apprenticeship Program," published by the United States Department of Labor, 1968 Edition, contains a Foreword by the President referring to the "changing technology" in the apprenticeable trades.

22. In 1968 the JATC has engaged in a substantial affirmative action program. Whatever its shortcomings, if any, in respect of informing the youthful citizenry of its program and the methods of affiliation, those shortcomings have certainly been remedied this year. Representatives of the JATC have in 1968 worked with the school authorities in the Cincinnati area, with the Apprentice Information Center in the State of Ohio, with the Urban League, and the NAACP —to the general end of making the P.R. E.P. Program successful. The P.R.E.P. Program is a Federally sponsored program (42 U.S.C. § 2572) and is designed to train youths of apprenticeable age, particularly in the minority groups, to enter these apprenticeship programs successfully. The program is described in detail in JATC Exhibit 8. It is found as a fact that the participation by the JATC in this program in 1968 is in good faith.

23. Except as specifically dealt with in this section, heretofore or hereafter, no evidence of pre-Act activity has been considered in making these findings. The BAT activity in 1963 (including Chapter 30), the substantial reorganization of the JATC related thereto in 1963, and the adoption of standards and procedures sufficiently objective (which applied with respect to the 1965 class for the first time) render irrelevant inquiry into previous activity. To cite a practical example, pre-1963 there is no doubt that apprentices came almost entirely from relatives of union members. In 1965 and thereafter, it has been demonstrated that a grandson of an International President of the Union and the son of U's President, active applicants to the program, were not admitted, but rejected. This certainly demonstrates a substantial termination of the guild system

and/or any nepotism. They were preferred a little on grading, but a fact is a fact, and the fact is they were rejected.

24. The JATC, between the adoption of its formal standards in 1963 and the filing of this lawsuit, notified only U, NECA, BAT and indirectly the Cincinnati Apprenticeship Information Center of its standards. It did not publicly disseminate information before 1968 concerning the opportunities available through the apprenticeship program and the prerequisites for admission to that program. BAT was responsible under a Labor Department directive for the dissemination of information to interested persons respecting a JATC program. JATC relied on BAT and its failure to disseminate information prior to 1968 was in good faith.

25. In 1967 BAT made a compliance examination of JATC in Cincinnati. While it was cursory, the examiner was required to check the activity of the JATC for compliance with the equal opportunity requirements of Chapter 30. The local office of BAT in 1967 (September) found JATC to be in compliance and that finding was concurred in by the Regional Director of BAT and also by the Ohio State Apprenticeship Council. JATC knew of both the fact of the compliance examination and also the favorable reporting. In its subsequent activity it relied in good faith on those known facts.

26. The number in the beginning apprenticeship class in recent years has been pegged at 40. The attrition over the four-year period is not significant, so that there are approximately 150–160 indentured apprentices eligible in this area.

27. The Collective Bargaining Agreement provides that an employer may be permitted to hire a maximum ratio of one apprentice to three journeymen, *if* such indentured apprentices are available. It is fair to say that there have been of re-

cent years a minimum of 1200 journeymen working in the union trade on an average. This, of course, would allow for a maximum of 400 indentured apprentices available. There is independent evidence in the record that a ratio of one to five would be sufficient, which would be 240. Recent years, of course, have been years of maximum employment involving urban development in this Cincinnati area of a type and on a scale unknown for many years. While there is testimony in the record that the expected scale of activity is up, we cannot find from the evidence that the limitation of available apprentices is at all related to discrimination. The number is fixed as a result of negotiation between the contractors represented by the contractor members of JATC and the U represented by the union members. The high figure mentioned by any contractor in any negotiations has been 60 and the figure of 40 has been arrived at as a result of bona fide negotiations having to do with estimates and the economics of the U and the contractors. There is no evidence in this record based on which there could be a finding that the fixation of the number had anything to do with keeping N's out of the apprentice program. The determination was the result of an application, to a problem of estimation, of expertise possessed by NECA and U (and not within the expertise of either the Attorney General [13] or a court).

28. The conclusory findings in respect of JATC are:

a) That in 1966 it did discriminate against Sawyer by reason of race or color (an unlawful employment practice);

b) That in the fall of 1965 the prescreening, as carried out, was discriminatory against the N applicants (an unlawful employment practice);

c) That in 1966, as well as 1967, the JATC's evaluation of the Educa-

---

13. The expertise is to be provided by the Department of Labor. 29 C.F.R. § 521.-3(g) directs BAT, in passing on a JATC plan to ascertain whether the "number of apprentices conforms to the needs and practices of the community."

tion Section (including class rank) was discriminatory by reason of race or color. There is no other rational explanation for the consistently different allocation of "extra points," to the favor of W's and the disfavor of N's.

d) The JATC has been in fact constantly improving its procedures from a Title VII point of view. These efforts have been in good faith and have not been as the result of any "shotgun." The evidence of this would include such things as dropping the "prescreening" and the employment of an expert transcript evaluator, and the continued employment of an aptitude advisor.

e) The "affirmative action" of the JATC this year clearly demonstrates a good faith effort to erase defects or deficiencies. This action was *not* taken as a result of this lawsuit, but independently of it.

f) The sole remaining vestige of discrimination in respect of the JATC is its failure to accept the valuations of its retained experts (transcript evaluation and aptitude)—i. e., the pattern of transposition favorable to W's and unfavorable to N's.

## Section VII.

### Conclusions of Law

1. The action by the Attorney General is appropriately filed under 42 U.S.C. § 2000e–6(b) and this Court has jurisdiction thereof. (28 U.S.C. § 1345)

2. The action by the plaintiff Dobbins is appropriately filed under 42 U.S.C. § 2000e (28 U.S.C.A. § 1331) and this Court has jurisdiction thereof.

■ 3. In addition, with respect to the plaintiff Dobbins, his action is appropriately filed under 42 U.S.C. §§ 1981 and 1983 (the Civil Rights Act of 1866). Jones v. Mayer, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). Membership in and/or a referral status in a union is a contractual relationship and/or a link in the chain of making a contract. The subject matter is, therefore, within 42 U.S.C. § 1981. Cf. Machinist v. Gonzales, 356 U.S. 617 (1958); Sullivan v. Little Hunting Park, 392 U.S. 657, 88 S.Ct. 2279, 20 L.Ed.2d 1346 (1968).

■ 4. At least since Jones v. Mayer, a strictly private right, be it in the property field as such, or the contract field as such, is within the protection of the Civil Rights Act of 1866 against interference by a private citizen or a group of citizens. Governmental sanction or participation is no longer a necessary factor in the assertion of a § 1981 action. Even assuming that it is, the extent of government (Federal, state and local) financing of the activity (building, etc.) in the geographical area, and specifically in the activities in which journeymen electricians engage, is sufficient in this case (approximately 75%) to answer the requirement. Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); and Ethridge v. Rhodes, 268 F.Supp. 83 (S.D. Ohio, 1967)

5. The defendant U is a labor organization engaged in an industry affecting commerce, as those terms are defined in 42 U.S.C. § 2000e(d and e).

6. The defendant JATC is a joint labor-management committee controlling apprenticeship within the meaning of 42 U.S.C. § 2000e–2(d).

7. Section 42 U.S.C. § 2000e–2(j) expressly prohibits the granting of preferential treatment to N's or any other group because of race, color or national origin on account of any imbalance which may exist with respect to the percentage of N's who are members or apprentices of Local 212 of U in comparison with the total percentage of N's in the local's geographical jurisdiction, or in the available work force. The fact that the racial composition of U's membership and apprentice program was predominantly W in and after July, 1965, is not evidence of discrimination after July, 1965.

■ 8. In an action brought by the Attorney General under Title VII, the burden of proof in respect of the essential elements of the case is on the plaintiff by a preponderance. The plaintiff must show that a pattern or practice exists and it is of such a nature as to deny the exercise of the protected civil rights and that it was so intended by the defendant.

9. Referral systems are not unlawful or discriminatory per se. Local 357, International Brotherhood of Teamsters, Inc. v. N.L.R.B., 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961).

■ 10. The defendant U has engaged in a pattern or practice of resistance to the full enjoyment by N's of equal employment opportunities protected by Title VII. It has been engaged in a pattern or practice of resistance to the full enjoyment of the following rights of N's (being rights protected by Title VII) —discrimination with respect to membership by reason of race or color and failure and refusal to refer for employment N's in ways which have deprived and/or tend to deprive N's of employment opportunity. Such patterns and practices have denied membership, referral opportunities and employment opportunities and employment. The pattern and practice has been engaged in since July, 1965, and is continuing. It is of such a nature as to deny the full exercise of such rights and it was and is intended by U to so do.

Insofar as this mixed conclusion of law and finding of fact is concerned, the evidence is clear and convincing and would satisfy the requirement of clear and convincing, as distinguished from preponderance. The same is true of the mixed findings of fact and conclusions of law hereinabove contained in this Opinion as follows: Section III Nos. 6, 8(c), 8(j), 9; Section IV Nos. 6, 10, 12, 13; Section V No. 4; Section VI Nos. 13, 21, 22, and 28. It does not follow that there are not other facts stated in the findings of fact that have been clearly and convincingly shown. There have been a great many of them. They have not been itemized above— those itemized are ones in which it might make a difference, depending on the determination of the proper degree of proof.

■ 11. In considering whether defendants are discriminating in violation of Title VII, evidence of the defendants' conduct prior to July 2, 1965, is relevant. Such past conduct may illuminate the purpose and effect of present policies and activities and show that policies which appear neutral are in fact designed to presently discriminate. Discrimination by labor unions, based on race or color, was illegal long before July 2, 1965. Steele v. Louisville & N. Railroad Co., 323 U.S. 192, 65 S.Ct. 226, 89 L. Ed. 173 (1944). Pre-Act discrimination does not furnish the basis for any relief under Title VII. United States v. Sheet Metal Workers, 280 F.Supp. 719, particularly at page 728 (1968, D.C.Mo.). The pattern or practice based on which a successful Title VII action may be maintained must be shown to have been one which existed or took place after, and not before, July 2, 1965. "Its effect is prospective and not retrospective." (Interpretive Memorandum of Title VII, Senators Clark and Case, 110 Cong.Rec. 7213.) From the same Memorandum: "The principal purpose * * * is to obtain future compliance."

While only a post-Act practice or pattern may furnish the basis for a Title VII claim, evidence of conduct pre-Act is competent and relevant for a number of purposes. One of them, for example, would be to aid in the determination of whether or not a particular practice or pattern, or system had been originally instigated by reason of anything discriminatory based on race or color. Obviously, if it was, the continuance for a day after July 2, 1965, would be discriminatory. If it was not—or stated otherwise, if it was adopted originally for a purpose having nothing to do with discrimination and for a legitimate economic purpose—the continuance could not be "per se" discriminatory. As another example of relevance, the Act requires an inquiry into the "intention" of the defendant, and that

is true whether the case is a private one or one brought by the Attorney General. See 2000e–5 and 2000e–6. In each situation the plaintiff has the burden of proving "intentional" engagement (in 2000e–5) and "intended to deny" (in 2000e–6). It is hornbook that even in the criminal field, in which evidence of prior conduct should be held more tightly in line than in a civil case, evidence of prior criminal activity is frequently competent and relevant to the question of "intent" of the defendant. It must necessarily follow that the same is true to a greater extent in the civil field. To take another and practical example from this case—the question whether a given examination administered after the Act was or was not a discriminatory "chilling" is much more approachable if it can be compared with pre-Act examinations than if it is approached in a vacuum. It is, therefore, concluded that pre-Act activity for a reasonable time before July 2, 1965—a reasonable time in this case being approximately six years—is competent and relevant, not for any substantive purpose; not for supplying proof of an essential element of the plaintiff's case; not for any purpose of visiting the sins of the forefathers on a present-day defendant; but for the purpose of interpreting post-Act activity and for the purpose of determining the intention—post-Act—of the defendant. While it should be limited to a reasonable length of time, latitude should be accorded a defendant for the purpose of counter-explanation. For example—taken from this case—if the evidence had been cut off at the five or six year stage, it would have indicated that some W's who did not have applications filed were examined at a time when N's were not; actually they did have applications filed prior to the six-year period.

■ 12. While the July 2nd date is the determinative one in the United States case and also in the Dobbins case insofar as the Dobbins case rests on Title VII, it is not the determinative date in the Dobbins case insofar as it rests on § 1981. In that respect the determina-

tive date would be the applicable statute of limitations. There being no Federal statute of limitations with respect to a Civil Rights Act of 1866 case, the most adaptable State statute governs. See Mulligan v. Schlachter, 389 F.2d 231 (6th, 1968). The most applicable Ohio Statute is R.C. of Ohio 2305.09(d.)—four years.

■ 13. It is the Government's position that Title VII, upon becoming effective, required a union (all W as the result of pre-Act discrimination) to take affirmative action to relieve the present-day result of pre-Act discrimination. Stated otherwise, the Government claims that discriminatory actions in the past have a continuing direct impact on individual electricians who, refused union membership or work in the past, are reluctant to subject themselves to similar treatment now. Our conclusion is to the contrary based on § 2000e–2(j).

In our view affirmative post-Act action, directed toward a group to correct pre-Act discrimination against that group constitutes the granting of preferential treatment to that group and on that subject Congress has specifically stated that Title VII shall not be construed so as to require a labor union to grant preferential treatment to any group based on race or color. See: Senator Dirksen, 110 Cong.Rec. 12381 (June, 1964) to the effect that the title "does not require preferential treatment to be given any * * * group on account of an imbalance * * *." Then Senator Humphrey, 110 Cong.Rec. 15333 (1964), "In fact, the title prohibits preferential treatment for any particular group. * * *" See also Senator Humphrey, 110 Cong.Rec. 12295, " * * * Title VII does not require an employer to achieve any sort of racial balance in his work force by giving preferential treatment to any individual or group. * * *" Senator Clark, 110 Cong.Rec. 6986 (1964), " * * * There is no provision * * * that requires or authorizes any Federal agency or Federal court to require preferential treatment for any * * * group for the purpose of achieving racial

balance. * * * The same is true of labor organizations. * * * Any deliberate attempt to maintain a given balance would almost certainly run afoul of Title VII * * *."

We, therefore, conclude that the U is not required to take any affirmative action other than that required by the Act itself (2000e–10—Posting of notices). It is not required to run a school to advance the skill of any group discriminated against prior to July, 1965; it is not required to seek out individuals in that group who may be competent for referral;[14] nor is it required to seek out individuals who may be competent to become members—and that even though membership or referral has been discriminatorily denied prior to the Act. Discrimination requires some initiative either on the part of the person discriminating or on the part of the person discriminated against. Two passives do not equal discrimination, as long as each remains passive.

14. When a union is all W and an N applies for membership for work and his application is administratively processed in a different manner than the application of a W person, a prima facie inference of discrimination arises. Cypress v. Newport News, 4 Cir., 375 F.2d 648.

15. A policy of giving priority in work referral to persons who have experience under the Local's Collective Bargaining Agreement is discriminatory when competent N's have previously been denied the opportunity to work under the referral agreement by reason of their race. Franklin v. Parker, 223 F.Supp. 724 (D.C.Ala., 1963).

16. When a labor union as a matter of policy organizes W contractors with W employees, but makes no effort to organize comparable N contractors or contractors having N employees, then organizational efforts of the union result in a limitation of employment opportunities for N's on account of their race and such organizational practices are prima facie in violation of Title VII. United States v. Post, 279 F.Supp. 60 (D.C.La., 1968). However, in order to make out such a prima facie case, the Government must at least show substantial and not isolated organizational efforts post-Act in respect of W contractors and at least the existence of an N contractor operating in the same specific field or fields as the W's. Neither has been shown in this case. At the most we have in this case evidence of an attempt (unsuccessful) to organize one W contractor post-Act and there is no evidence of any comparable N contractor. As Senator Humphrey said, 110 Cong.Rec. 13776 (1964), " * * * single, insignificant, isolated acts" do not "justify a finding of a pattern or a practice."

17. In some fields a prima facie case of pattern and practice is made out on a showing that given privileges are exercised only, or for the greater extent, by W's and that there is in the area a substantial N population and that there have been repeated attempts by N's to exercise such rights. Such is certainly true in the education and voting fields. However, we deal here with a "craft" union.[15] It is one thing to presume or assume, prima facie-wise or otherwise, that a significant number of a group have the qualifications for schooling or voting, or jury service. It is another thing to assume, prima facie-wise or otherwise, that because a certain number of people exist, be they W or N, that any significant number of them are lawyers or doctors, or merchants, or chiefs—or to be concrete, are competent plumbers or electricians, or carpenters. While the electricians may only date back to Benjamin Franklin, they are part and parcel of building trades and from time immemorial the word "craft" is necessarily entwined with skill. That is true even in the dictionary.

To make out a prima facie case for class purposes, as distinguished from

---

14. It need not "recruit." United States v. Ironworkers, USDC N.D.Ill.E.D., 68 C. 676, (May 1968).

15. There is no such thing as an "Instant Electrician"—by Court decree or otherwise.

individual purposes, the plaintiff has the burden of showing the existence of a significant number of members of the group possessing the basic skill in the particular trade involved. The plaintiffs have shown the existence of some members of the class who are skilled and who have applied and as to those it has established a case. We cannot assume and do not assume from that that there are other members of the group similarly qualified. As the Supreme Court said in Norris v. State of Alabama, an early jury service case, 294 U.S. 587, at page 597, 55 S.Ct. 579, at page 583, 79 L.Ed. 1074:

> "There was abundant evidence that there were a large number of negroes in the county, who were qualified for jury service. Men of intelligence, some of whom were college graduates, testified to long lists (said to contain nearly 200 names) of such qualified negroes, including many business men, owners of real property and householders. When defendant's counsel proposed to call many additional witnesses in order to adduce further proof of qualifications of negroes for jury service, the trial judge limited the testimony, holding that the evidence was cumulative."

There is no evidence in this case of the existence in the class of any significant number who are competent.[16] That is not to say that there may not be. There well may. But there is no showing of it in this case. There is a showing of the relationship between plying the trade of an electrician and the safety of others, and the safety of property of others. The building codes themselves assume that. No court should engage in assumptions in such a field.

■ 18. The limitation of either union or apprentice membership to a number far below the number necessary for the particular trade would be a discriminatory practice and pattern in a context involving an all W union member-

ship with a previous history of discrimination. Louisiana v. United States, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965). However, on a showing by a defendant that the limitation has nothing to do with any discriminatory intention but is related to a reasonable economic purpose, the limitation in number is not unlawful. Stated otherwise, if the limitation was adopted without relation to any discriminatory purpose, but was adopted for a reasonable economic purpose, Title VII does not require the increase in number even though the union previously (to the Act) discriminated. As Mr. Justice Douglas said in N.L.R.B. v. Industrial Union of Marine and Shipbuilding Workers, 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968), 29 U.S.C. § 158(b) (1) (A) "preserves to a union 'the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of a membership therein.'" Title VII directs that from and after its effective date, all have an equal opportunity to come within the number.

■ 19. Preference to union members in work referral is a violation of Title VII if that preference operates, after July, 1965, to continue to restrict the employment opportunities of N's who have been excluded from membership and work under union auspices because of their race. United States by Clark v. Local 189, United Papermakers and Paperworkers, 282 F.Supp. 39 (D.C.La., 1968); Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (D.C.Va., 1968). While such a practice may also be within the jurisdiction of the N.L.R.B. and, from the point of view of the Labor-Management Relations Act, it is exclusively within the jurisdiction of the N.L.R.B. (Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938)) neither Title VII, nor the Labor-Management Relations Act was intended to preempt the other. Local Union No. 12, etc. v. N.L.R.B., 5 Cir., 368 F.2d 12.

16. Cf. the "qualification" importance in Foster v. Mobile County Hospital Board, 398 F.2d 227 (C.A. 5, May, 1968) and the "professional ability" reference in Meredith v. Allen County, 397 F.2d 33 (C.A. 6, June, 1968).

20. Insofar as this Court in this action is concerned, the U's referral system is countenanced by subsection (f) of the National Labor Relations Act, 29 U.S.C. § 158(f). Whether it does or does not comply with the permissions of that section is not a matter for this Court in this case, but is within the jurisdiction of the N.L.R.B. Whether the referral system, as presently in effect, complies with the requirements of Title VII is a question within the jurisdiction of this Court in this action. There is nothing preempting that problem to the N.L.R.B. Local Union No. 12, etc., v. N.L.R.B., supra, cert. den. 389 U.S 837, 88 S.Ct. 53, 19 L.Ed.2d 99, reh. den. 389 U.S. 1060, 88 S.Ct. 762, 19 L.Ed.2d 866. While the plaintiff Dobbins has appropriately injected the question of the constitutionality of 8(f) in this case from a pleading point of view, there was no implementation as is required (even in an "as applied" claim—Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965)) under 28 U.S.C. § 2282. Cf. Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). In any event, the claim of unconstitutionality of § 158(f) (4) is not considered substantial. Idlewild Bon Voyage Liquor Corp. v. Epstein, 370 U.S. 713, 82 S.Ct. 1294, 8 L.Ed.2d 794 (1962).

21. There is nothing in Title VII which required the U to publicize generally or to the N community[17] its policies in respect of admission or referral. The only affirmative requirement has been noted above and such publication would be an affirmative requirement.

22. The United States is entitled to injunctive relief to insure the full enjoyment by N's of the rights secured by Title VII. The Court is obliged to utilize the full and lasting resources of equity by fixing specific remedial relief to insure to N's the full enjoyment of the right of equal employment opportunities. Louisiana v. United States, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965). Relief requiring affirmative remedial action in order to correct the effects of a post-Act pattern and practice is necessary and proper. Where a labor union has engaged in a pattern or practice, the form and substance of the relief must be designed to effectuate the declared Congressional policy of open employment opportunities to those who, since the Act, have been denied them because of their race. Such relief necessarily includes the adoption of objective reviewable standards and procedure. Vogler v. McCarty, 294 F. Supp. 368 (E.D.La.1967).

23. An appropriate remedial order must accomplish at least three objectives in addition to prohibiting future violations. In the first place, it should "deprive a defendant of the gains from his wrongful conduct" by "undo[ing] what could have been prevented had the defendants not outdistanced the government in their unlawful project." Schine Chain Theaters v. United States, 334 U.S. 110, 128, 68 S.Ct. 947, 957, 92 L.Ed. 1245 (1948). In the second place, it should "so far as possible eliminate the * * * effects of the past," Louisiana v. United States, supra, and may, in this respect, affect otherwise valid or unlawful practices if that is necessary "in order that the ground may be cleansed effectually from the vice of the former illegality," United States v. Bausch & Lomb Optical Company, 321 U.S. 707, 724, 64 S.Ct. 805, 814, 88 L.Ed. 1024. Thirdly, the decree should close off "untraveled roads" to the illicit end and not "only the worn one." International Salt Company v. United States, 332 U.S. 392, 400, 68 S.Ct. 12, 92 L.Ed. 20 (1947). Since Title VII prohibits "sophisticated as well as simple-minded modes of discrimination" Cf. Lane v. Wilson, 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281 (1939) and since the methods of excluding N's from employment opportunities in the present case have been varied, it is particularly important that the relief afforded curb as far as possible the possibility of future methods of

17. as distinguished from an inquiring individual

discrimination. Employment discrimination is typically not open but subtle and elusive. See Holland v. Edwards, 307 N.Y. 38, 119 N.E.2d 581, 44 A.L.R.2d 1130 (N.Y.Ct.App.1954).

24. In reviewing statutes, rules or conduct which result in the effective denial of equal rights to Negroes or other minority groups, intention can be inferred from the operation and effect of the statute or rule or from the conduct itself. The conduct of defendant in the present case "by its very nature" contains the implications of the required intent. Local 357, Intern. Broth. of Teamsters, etc. v. National Labor Relations Board, 365 U.S. 667 at 675, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961) citing Radio Officers' Union, etc. v. National Labor Relations Board, 347 U.S. 17, 45, 74 S.Ct. 323, 98 L.Ed. 455 (1954). See also the remarks of then Senator Humphrey, 110 Cong.Rec. 14270 in reference to Title VII, "Intention could, of course, be proved by or inferred from words, conduct or both." Thus the Attorney General has a cause of action when the conduct of a labor organization in relation to N's or other minority groups has the effect of creating and preserving employment opportunities for W's only. Section 707(a) of the Civil Rights Act of 1964.

25. Following are the unlawful employment practices engaged in by U since July of 1965. Each of the following described practices was intentionally designed to either exclude an N from membership or refuse to refer for employment, or both; and each act deprived, and was intended to deprive an individual of employment opportunities; and each act, being of such a nature, was based upon discrimination, i. e., an intent to treat the N differently than he would have been treated had he been W.

a) The failure and refusal to inform N's of the referral system and the opportunity for employment through the referral system. The U owed to each electrician craftsman in its geographical area the duty of informing him upon his entrance into the U office, whether for membership or work, of the referral system. The U performed this duty to W's; it completely neglected to perform it to N's.

b) The failure in July, 1966, to list Sharpe as a class 2 referral.

c) The failure to inform and/or the misinformation to Frank Sawyer in 1966.

d) The failure to inform each of the following in respect of the referral system and the failure to include each of the following on the referral list, and the failure to refer each of the following:

Charles Letcher in July of 1965
William S. Andrews in August of 1965
David A. Brown in August of 1965
William Harden in August of 1965
Anderson Dobbins in September of 1965

e) The failure to administer any regular journeyman's examination from July, 1965, to July, 1967.

f) The competency exam in 1966—not per se but per accidens. The "accidens" included the efforts to get the N's who had membership applications pending to take an exam which was not a membership exam; it included the failure of the U to properly inform anybody of the actually existing referral system and its relationship to eventual U membership.

g) The administration of the "chilling" exam for journeymen in 1967.

h) The arbitrary determination in 1967 that the failure to take a maladministered competency exam amounted to a withdrawal of an application for U membership.

i) The failure to inform N's who applied for membership since July, 1965, that the U never gave a membership exam to anybody who was not employed by a union contractor;

coupled with that, the designed lulling of the N's into a sense of proceeding properly by permitting them to sign an application, knowing full well that under the U policy, such was an empty gesture.

j) The representation to N's after July, 1965, made when applications were accepted for membership, that an examination would be given to them some time.

k) The exclusion of N's from the opportunity of taking the July, 1967, exam.

26. The JATC, being a Labor-Management Committee covered by Title VII (2000e (d and e)) engaged in the following unlawful employment practices in discrimination against N's by reason of race and color in the JATC program in the Cincinnati geographical area. Each of the practices tended to deprive individuals of employment opportunities because of race or color. The practices in and of themselves are so designed and such was the intention of the JATC.

a) The discrimination against Sawyer in 1966.

b) The prescreening in 1965.

c) The "extra point" allocations in 1966 and 1967.

27. The JATC's standards and procedures, per se and as written, are not discriminatory. This is determined as a matter of law and as a matter of fact, the latter de novo. The standards and procedures were submitted to the BAT as has been hereinabove described. They have been approved by that agency.

▬▬▬ We note first that the agency charged with the enforcement of Title VII, the Equal Employment Opportunity Commission, is authorized by Congress only to issue "suitable *procedural* regulations." That excludes substantive and the history of the adoption of the Act bears this out. In committee —after the Act as passed by the House contained only the words "suitable regulations"—the word "procedural" was in-

jected. On the other hand, under 29 U.S.C. § 50, the Secretary of Labor has been charged, since at least 1937, to formulate and promote labor standards of apprenticeship. Since the Davis Bacon Act, his responsibility in that area has markedly increased. The detail of the activity of the Bureau charged specifically with the responsibility, i. e., BAT, is set forth exhaustively in Gregory Elec. Co. v. United States Dept. of Labor, 268 F.Supp. 987 (S.C., 1967), and will not be repeated here, although it is incorporated by reference. We quite agree with District Judge Simons' conclusion, stated as follows:

"The decision on whether to register an apprenticeship program requires a substantial amount of judgment and expertise. Such decision may turn on many technical facts. These are clearly matters which Congress has left to the agency, and matters in which the court should not interfere." [18]

It is true that the *Gregory* case did not involve Title VII and it is also true that the fundamental responsibilities in respect of the enforcement of Title VII have been left to the courts. We make the further point that as long ago as 1963 the Labor Department, dealing specifically with apprentice programs, adopted as Chapter 30 extensive regulations and standards dealing with the specific problem of equal job opportunity in the specific field of apprenticeship. Our conclusion from a review of such cases as—

United States v. RCA, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959); Pan American World Airways v. United States, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963); United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); United States v. First City National Bank, 386 U.S. 361, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967); is this: Whether approached from an abstention point of view, or a "primary

18. We note, again, that the "number" of apprentices required in a geographical area is committed to the "expertise" of BAT.

jurisdiction" point of view, the Labor Department's approval of an apprenticeship plan, including standards and procedures, as standing the equal opportunity test, is at least entitled to a prima facie consideration in a district court and, at the other end of the spectrum, should not be interfered with lacking some clear and persuasive showing of deficiency under Title VII. Furthermore, the particular plan and the particular procedures involved in this case have been examined de novo, and we find nothing therein contra to, but the aggregate thereof in compliance with, Title VII.

■ 28. Based on the cases cited immediately above and, in addition, Cypress v. Newport News, supra, we conclude that the compliance examination by BAT (in which the question involved is: "Did the JATC comply in practice with a plan and procedure which complied on its face?") is entitled to little, if any, weight in a subsequent judicial proceeding. Such a question is fundamentally judicial (United States v. Philadelphia National Bank, supra) and if it involves expertise, it is judicial expertise.

■ 29. Since JATC has discriminated, an injunction should issue unless there is clear evidence that defendant has completely abandoned its past illegal practices. United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); United States v. Atkins, 323 F.2d 733 (5th, 1963). Based on the same authorities, the burden of proof is on the defendant to demonstrate that the wrong will not be repeated, and it is a heavy one. The factors to be considered, in deciding whether abandonment of past illegal conduct is shown, are:

a) The bona fides of the expressed intent to comply,

b) The effectiveness of the discontinuance,

c) In some cases, the character of the past violations.

■ 30. In an action commenced by an individual under Title VII, if an individual plaintiff prevails, he may be allowed a reasonable attorney's fee as part of the costs. § 2000a–3(b). The purpose of this section was this—"It was evident that enforcement would prove difficult and the nation would have to rely in part upon private litigation as a means of securing broad compliance with the law." Newman v. Piggie Park, supra. As the Court said in that case (390 U.S. at 402, 88 S.Ct. at 966, 19 L.Ed.2d 1263):

"One who succeeds in obtaining an injunction * * * should ordinarily recover an attorney's fee unless special circumstances would render an award unjust."

The plaintiff is entitled to reasonable attorney's fees for the services of counsel rendered up to and including the time his case was consolidated with the case brought by the United States. The services thereafter rendered plaintiff Dobbins were in his individual capacity as distinguished from a vindicator of a public policy.

*Section VIII.*

*Relief*

1. The parties are requested to promptly attempt to agree on a decree in each case consistent with the foregoing Findings of Fact and Conclusions of Law. If the parties are unable to do so, each party in each case may present his or its own proposed decree. In any event, one or the other method of settlement will be followed within fifteen (15) days from the date of the filing of this Opinion.

(a) The decree in case No. 6421 (Dobbins) will direct the Union to forthwith admit him to full membership in the defendant Union,[19] with an admission date

---

19. if Dobbins still desires membership— this would necessitate his abandonment of his contracting business. The union's rule prohibiting a contractor from becoming a member of a local is reasonable. "No man can serve two Masters."

effective (from any point of view related to future work or referral) as of September 14, 1965, being the first date subsequent to July 2, 1965, that the Union discriminated as to him by accepting a membership application with the omissions and under the circumstances hereinabove described.

The decree, as to him, will further direct the Union to immediately refer him for work. He will be credited on the Union records with work in the trade since January 1, 1965 (his actual activity began "some time in 1964"—hence, the first certain date) and, in addition, he will be credited with work for a union contractor since September 15, 1965. These credits are, of course, to be effective for any future referral under any system.

Costs will be awarded to him, including a reasonable attorney's fee, within the areas above indicated, to be subsequently determined on hearing.

(b) The decree in the Government case (6473) will contain these items as a minimum:

1) The Union will be directed, upon written or oral request, to forthwith refer, for work in the trade for a union contractor, William H. Sharpe. He will be credited on the records of the Union for work in the trade for a union contractor since July 20, 1966, the date of the first discrimination as to him to the date of referral.[20]

2) The Union will be directed to forthwith refer, on either written or oral request, Charles Letcher, William S. Andrews, David A. Brown, and William Harden, and each will be credited, respectively, on the records of the Union, with work in the trade

for a union contractor from the respective date of the initial application for membership made by him,[21] such being the date of the initial discrimination as to him under the foregoing facts and conclusions. In addition, and in respect of any of those four individuals who request referral and continue to desire membership, this—

> In respect of any such who, within a year, successfully pass an examination[22] administered by the Northern Kentucky Electric Authority, the Union will, upon presentation of evidence thereof, admit such individual to membership, with accredited membership date as of the individual's application date (being the respective date set forth above). Of course, nothing contained herein or therein can or should in any way interfere with the exercise by any union contractor of his contractual right to determine the fitness of any individual named herein. It is the obligation and function of a court merely to supply the opportunity to demonstrate with the appropriate, in any event, correction for past discrimination.

We differentiate between Dobbins on the one hand and these four individuals on the other hand for this reason. This record is clear that Dobbins, by qualification, as well as experience, is a qualified journeyman electrician; that, not only by reason of education and experience but also in fact, this record affirmatively shows that he has passed a municipally administered exam for such purpose. Another factor involved is this— union membership as such dispenses with preliminary examining by municipal corporations in this geographical

---

20. A direction for "immediate" or "forthwith" referral means, of course, in response to the first available request by a union contractor, and, as an example of the detail which the parties should cover in any proposed decree, the referral should be "run of the mine."

21. In Letcher's case—July 2, 1965.

22. (journeyman electrician)

area, and this record affirmatively shows that also.

The record is convincing that these four individuals should be referred. We cannot say that it is convincing that the four individuals should be immediately inducted into Union membership without any previous effective examination by anybody—union contractor -wise or otherwise.

■ (c) The Government urges that the decree should effectively erase the entire Union referral system. There is no question of the power of a court to do this in a Title VII decree. The fact that there are other persons to the referral system contract, not parties to this case (to-wit, union contractors) would present no problem since the actual negotiation of the presently existing referral system occurred after the effective date of Title VII, and such contract must stand or fall accordingly. Compare Steele v. Louisville & N. Railroad Co., supra. Basically it is the Government's contention that the extension of a referral system which creates pluses for union members [23] or work in the trade for a union contractor is, in and of itself, a continuing discrimination, if, prior to the Act, the union—by discrimination—saw to it that N's got no experience in the trade for a union contractor nor became members of the Union. Quarles v. Philip Morris, Inc., supra, and United States v. Local 189, United Papermakers and Paperworkers, supra, are urged as authority for that. The Government's position is essentially based on the education and jury qualification and voter qualification civil rights cases.

Unquestionably, seemingly innocuous standards may become presently discriminating simply by virtue of the fact of past discrimination.[24] We have no quarrel with *Quarles* or *Local 189*. Each of them dealt with a factual situation in which there was unquestionably a class of N's *containing a significant number of* people in the relevant situation who were competent, vis-a-vis, the occupation involved. If there were a showing in this record that there are a significant number of competent N electricians (over and above the ones dealt with specifically herein) we would have no hesitancy in erasing the entire referral system and directing a new start. There is no such showing in this record and, as we have herinabove referred to, in its present form this record indicates the exact opposite. The de facto situation *may* in fact be different and that possibility points the way to a result.

■ The referral system has been in use for a long time. It is, generally speaking, countenanced by § 158(f)(4) and its serves some obvious economic needs of electricians and contractors throughout the country, which would continue to exist and be so served if the defendant U were today half N and half W. Courts, which are even reluctant to interfere with the internal affairs of corporations (McQuillen v. National Cash Register, 112 F.2d 877 (4th, 1940)) should be just as wary of interfering in the internal affairs of any union. That is certainly the sense of 29 U.S.C. § 158 (b) (1) (A). The present referral system—with some obvious legitimate ends—should not be eradicated unless such eradication is certainly required by Title VII. Title VII does not require such unless there are a significant number of people actually being discriminated against, who have the present capacity to pass the real test of an electrician. Such real test, on this record, is satisfactory work for an electrical contractor.

---

23. We emphasize again that this is a Title VII case and not a labor case, the practical effect—from a Title VII viewpoint —is that there are pluses for union membership, whether in this local or any other local.

24. Cf. Gaston City v. United States, 288 F.Supp. 678 (U.S.D.C.D.C.—Three Judge Ct.—1968).

The decree, therefore, will direct the Union to suspend operation under or adherence to the present referral system pending further order of this Court. Within a period of thirty (30) days, a temporary referral system will be hammered out, which will not include differentiation based on union membership, or the passing of a union examination, or work for a union contractor. The temporary referral system may otherwise be based on the factors mentioned in 29 U.S.C. § 158(f), being minimum training, minimum experience, length of experience in the trade and the particular geographical area. "In the trade" will include "from top to bottom" as heretofore dealt with and will include work for any contractor in the electrical trade, whether union or non-union. The referral system will also hammer out objectively the method by which the U will determine whether an individual is qualified for referral at all. For example, "a minimum of two years, and based on the individual's own statement." It will be objective and will expressly deal out the "prerogative" system now in effect. While the U is the initial judge of a "qualified employee" (29 U.S.C. § 158) it must judge by objective standards. The eventual real test is the ability to work in the normal middle "run of the mine" job for a union contractor. In due course of time, events will indicate whether the actual facts call for a total erasure of the referral system being suspended, or a determination that the problem has been or could be dealt with effectively on an individual basis.

(d) For all enforcement purposes, as well as for the "evaluation in practice" (Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716) this Court will retain jurisdiction of the Government case against the Union. No good reason appears to retain jurisdiction of the Dobbins case.

(e) With respect to the JATC—the JATC will be directed to admit, on his request, Frank Sawyer to its next starting apprentice class. In addition, since the discrimination as to him occurred in 1966, the JATC will be required to accomplish payment to Sawyer of that wage which he would have been earning had he been admitted in 1966, meaning that his starting wage will be 60% of the journeyman wage if he starts in the 1968 class, 75% if he starts in the 1969 class, and full journeyman's wages beginning in September, 1970, if he starts then, or if he is in the course at that time and successfully accomplishing it up to that time.

The JATC will be, of course, generally prohibited by decree from engaging in any discriminatory conduct and specifically will be mandatorily directed to accept objectively the evaluations of its experts. This does not necessarily deprive the JATC of some discretion in areas where discretion would be obviously allowable; it does deprive the JATC of arbitrary and inexplicable differences from its own experts' reports.

(f) This Court will retain jurisdiction over this case insofar as the JATC is concerned, for compliance purposes. That conclusion is arrived at reluctantly in the light of our finding of fact dealing with the present good faith of the JATC. However, it is the obligation of a District Court in a circumstance of past substantial discrimination, not all of which has been clearly shown to have been eradicated. Raney v. Board of Education, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968); Green v. County School Board, supra.

(g) In the Government case (6473) no allowance for costs will be made. Each party will pay its own. The financial impact of this case on the defendant has been obviously of the magnitude that, as a matter of discretion, the impact will not be added to.

## APPENDIX A.

### Abbreviations

B.A. — Business Agent, Local 212

B.U.C. — Bureau of Unemployment Compensation, State of Ohio

C.C.Y. — Citizens Committee on Youth—Federally financed program—29 C.F.R. 50

D — Dobbins, plaintiff

G.E.D. — General Educational Development Test

I.U. — International Brotherhood of Electrical Workers, AFL–CIO

J.A.T.C. — A joint industry committee—Cincinnati Joint Apprenticeship Training Committee, operating in the electrical field. Other committees operate in other fields, e. g., plasterers, carpenters, ironworkers. Three of the members are appointed by N.E.C.A. and three by U (i.e., Local 212).

J.U.M.P. — Journeyman Union Manpower Program (1966 Federal Project—only 19 students produced—36 needed—a fizzle.) Replaced in 1967 (first time operational 1968) by P.R.E.P.

N — Negro

N.E.C.A. — Cincinnati Chapter, National Electrical Contractors Association

O.S.A.C. — Ohio State Apprenticeship Council

P.R.E.P. — Preparation Referral Employment Program—administered by C.C.Y. (29 C.F.R. 50)

U — Local No. 212, International Brotherhood of Electrical Workers, AFL–CIO

U.S. — United States

W — White

---

## APPENDIX B.

### STATUTES AND REGULATIONS SPECIFICALLY INVOLVED

The following are the pertinent portions of statutes which will be referred to somewhat repetitively.

29 U.S.C. § 158(f)

"It shall not be an unfair labor practice * * * for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged in the building and construction industry with a labor organization of which building and construction employees are members * * * because * * * or (2) such agreement requires as a condition of employment, membership in such labor organization after the seventh day

following the beginning of such employment * * * or (3) such agreement requires the employer to notify such labor organization of opportunities for employment with such employer, or gives such labor organization an opportunity to refer *qualified* applicants for such employment, or (4) such agreement specifies *minimum* training or experience qualifications for employment or provides for priority in opportunities for employment based upon length of service with such employer, in the industry or in the particular geographical area * * *."

42 U.S.C. § 2571 et seq., as amended April 26, 1965, constitutes a Congressional finding of critical need for "more and better trained personnel" in, among other things, "apprenticeable categories;" declares the desirability of the determination of such shortages and of the persons "who can be qualified for these positions through education and training;" it further declares a Congressional purpose of developing and applying information and methods "needed to deal with the problems of unemployment resulting from automation and technological changes."

The problems of evaluation, information, research and job development programs are devolved upon the Secretary of Labor. The Secretary is directed to stimulate and assist, in cooperation with interested agencies both public and private. Loans or grants to such agencies are authorized.

It is by virtue of these Congressional actions that the funds necessary to carry out the P.R.E.P. programs were provided by the Federal Government.

See also 29 C.F.R. Part 50, dealing with "Neighborhood Youth Corps Projects" of import only in that the regulations themselves with respect to this type of Federal activity set forth both educational and age qualifications.

42 U.S.C. § 1981 provides that "[a]ll persons * * * shall have the same right in every state * * * to make and enforce contracts * * *."

42 U.S.C. § 1988 provides:

"The jurisdiction in civil * * * matters conferred on the district courts by the provisions of this chapter and Title 18, for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies * * * the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil * * * cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, * * *."

### Title VII (2000e)

42 U.S.C. § 2000e(d) provides:

"The term 'labor organization' means a labor organization engaged in any industry affecting commerce * * * which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment, * * *."

42 U.S.C. § 2000e(e) provides in part:

"A labor organization shall be deemed to be engaged in an industry affecting commerce if (1) it maintains or operates a hiring hall or hiring office which procures employees for an employer or procures for employees opportunities to work for an employer * * *."

42 U.S.C. § 2000e–2(c) provides:

"It shall be an unlawful employment practice for a labor organization—

(1) to exclude * * * from its membership, or otherwise to discriminate against, any individual because of his race, color, * * *

(2) to limit, segregate, or classify its membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, * *."

42 U.S.C. § 2000e–2(d) provides:

"It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training * * * to discriminate against any individual because of his race, color, * * * in admission to, * * * any program established to provide apprenticeship * * * training."

42 U.S.C. § 2000e–2(h) provides:

"Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system * * * provided that such differences are not the result of an intention to discriminate because of race, color * * *, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, * * *."

42 U.S.C. § 2000e–2(j):

"Nothing contained in this subchapter shall be interpreted to require any employer * * * labor organization, or joint labor-management committee * * * to grant preferential treatment to any individual or to any group because of the race, color, * * * of such individual or group on account of an imbalance which may exist (we parenthetically note the effective date of this present tense verb was July 2, 1965) with respect to the total number or percentage of persons of any race, color * * * employed by any employer, referred or classified for employment by any * * * labor organization * * * or admitted to * * * any apprenticeship * * * program, in comparison with the total number or percentage of persons of such race, color * * * in any community * * * or other area, or in the available work force in any community * * * or other area."

42 U.S.C. § 2000e–3 provides:

"It shall be an unlawful employment practice * * * for a labor organization to discriminate against any * * * applicant for membership, because he has * * * made a charge * * * in any manner in an investigation, proceeding, or hearing under this subchapter."

A person aggrieved by an "unlawful employment practice" may institute a civil action subsequent to certain statutorily described preliminaries in the appropriate United States district court (2000e–5(e)) and subsection (g) provides:

"If the court finds that the respondent has *intentionally* engaged in or is *intentionally* engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include * * * hiring of employees * * *. No order of the court shall require the admission * * * of an individual as a member of a union or the hiring * * * of an individual as an employee, * * * if such individual

was refused admission \* \* \* or was refused employment \* \* \* for any reason other than discrimination on account of race, color, \* \* \*."

42 U.S.C. § 2000e–5(k) provides:

"In any action \* \* \* under this subchapter the court, in its discretion, may allow the prevailing party \* \* \* a reasonable attorney's fee as part of the costs \* \* \*."

42 U.S.C. § 2000e–6 provides:

"Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature *and is intended* to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court \* \* \* setting forth facts pertaining to such pattern or practice, and requesting such relief, including \* \* \* injunction, \* \* or other order against the person or persons responsible for such pattern or practice, as he deems necessary to insure the full enjoyment of the rights herein described." [1]

29 U.S.C. § 50 (effective since at least 1937) provides:

"The Secretary of Labor is authorized and directed to formulate and promote the furtherance of labor standards necessary to safeguard the welfare of apprentices, to extend the application of such standards by encouraging the inclusion thereof in contracts of apprenticeship, \* \* \* to cooperate with State agencies engaged in the formulation and promotion of standards of apprenticeship \* \* \*."

29 U.S.C. § 50a provides:

"The Secretary of Labor may publish information relating to existing and proposed labor standards of apprenticeship, and may appoint national advisory committees to serve without compensation. Such committees shall include representatives of employers, representatives of labor, educators, and officers of other executive departments, with the consent of the head of any such department."

Insofar as the record in this case indicates and insofar as this Court is informed by any and all of the parties to this case, and insofar as we can ascertain by independent investigation, the Secretary of Labor has not implemented this section. The National Joint Apprenticeship Training Committee referred to in this case is a voluntary association at the national level of the International Electrical Union and the National Electrical Contractors Association. It consists of six representatives, three appointed by each. It has counterparts in various portions of the country on a community level. One of its counterparts is known as the Cincinnati JATC. We are not informed on this record of the relationship, if any, on either a formal or informal basis, between the National JATC and the Department of Labor. Nor are we very much informed of the relationship between the National JATC and the local JATC, except that the national assists the local in formulating and distributing the local's standards in respect of administration, training and examining, e. g., the national suggests exam questions.

To further complicate matters, there is a bureau in the Department of Labor of the United States, known as the "Bureau of Apprentice Training" and referred to generally as BAT. It is probably the only bureau that is unable to point to either a statute or a regulation creating it. It does exist. It has various offices throughout the country, one of which is in Cincinnati. Regula-

---

1. Title VII expressly renders the Norris La-Guardia Act inapplicable to an "individual" action against a union. While the expression is omitted from (e–g, et seq.) dealing with an action by the Attorney General, the purpose filters through. The Norris LaGuardia Act does not apply in either case.

tions have devolved upon it various jobs and responsibilities. The one set, of interest in this case, is in 29 C.F.R. Part 521, captioned, "Employment of Apprentices." It provides, insofar as it is of interest here, that the administrator may issue special certificates to employers or joint apprenticeship committees authorizing the employment of apprentices in skilled trades at wages lower than the minimum wage applicable under Section 6 of the Fair Labor Standards Act of 1938 as amended. In other words, the sanction invokable by the Labor Department, insofar as it is involved in this case, is this—on certain projects apprentices may be employed and paid smaller wages than journeymen, if they are enrolled in an "approved" apprenticeship or joint apprenticeship program. This chapter of the regulations authorizes "registration" of joint apprenticeship plans with BAT; it sets forth standards which must be included in those apprenticeship programs. For instance, one of them is a minimum age of 16; another is that the trade involved must be an apprenticeable occupation; another requirement is "an indication that the number of apprentices to be employed conforms to the needs and practices in the community;" related instruction is required.

The chapter further and significantly calls for the issuance of a "certificate" of approval of the particular joint apprentice plan to the committee, as well as to each applicant. Administrative appeals are provided for. In other words, in summary, BAT in particular and the Labor Department in general are the agencies of the Federal Government charged with the responsibility of examining and approving programs involving the joint apprenticeship training by employers and a union in a particular locality.

Part 30 of Title 29 C.F.R., entitled, "Nondiscrimination In Apprenticeship and Training" sets forth "policies and procedures to promote equality of opportunity in apprenticeship and training programs registered with the Bureau of Apprenticeship and Training." These policies apply to the selection, to waiting lists, to employment during apprenticeship, etc.

Section 30.3 sets forth equal opportunity standards which must be in any particular plan.

Section 30.4 defines the methods which may be used in the selection of apprentices. The various methods mentioned include such things as fair aptitude tests, school diplomas, age requirements, fair interviews, school grades, and previous work experience. Overall, the requirement is this—"Qualifications and eligibility must be determined by specific requirements so that questions of discrimination in selection can be fairly adjudicated." The selections must be on the basis of "qualifications alone." The detail of this chapter would unduly prolong this section, so we make no further attempt to detail it—suffice to say that the detail is "in chapter and verse" and is specific in respect of the "formal nondiscrimination provisions."

This subchapter not only devolves upon the Bureau the job of registering or refusing to register a particular joint apprenticeship plan based on compliance or non-compliance with the formal requirements, but it significantly contains this in 29 C.F.R. 30.9:

"The Bureau shall conduct a systematic field review of existing federally registered programs, inform program sponsors of the equal opportunity standards, encourage their adoption, and take appropriate action regarding programs which do not adopt and *operate* in accordance with the standards. Each program field review shall involve the following steps:

" * * * Where the composition of the program demonstrates that there is equality of opportunity, no further field review will be made."

In other words, as applied to a program in which, by the simple test of statistics,

there may be inequality of opportunity, further review is directed by the regulations. This subsection goes ahead and describes what items will be checked and the description takes up about a page of fine print. That is not all. After the review by the local BAT, the file is forwarded to the Regional Director and the regulations require him to review, among other things, "findings of conformity" and it directs what action will be taken by the Regional Director in the event of non-conformity. In summary, there are two separate chapters of regulations which require the Labor Department of the United States Government to check into the plan and the activity of the Cincinnati JATC both from a point of view of standards and from a point of view of conformity.

Furthermore, in this particular instance, the plan of the Cincinnati JATC was also reviewed and approved by the Bureau of Unemployment Compensation, the Ohio State agency charged with the fair administration of apprentice plans both from an overall point of view and specifically from an equal opportunity point of view. In this connection, there are things called "council state" and "non council state". A council state is one having a state agency charged with equal opportunity employment responsibility; mechanically, while the federal regulations deal out the specifics in apprenticeship plans and programs, in a council state, the local installations of the Labor Department turn over the end result of their work in this field to the state agency and the state agency comes up with, for the sake of example, a state joint apprenticeship plan in the electrical field. Similarly, the local BAT makes its reports to the Ohio Bureau of Unemployment Compensation and that Bureau reports to the Labor Department in Washington. Because of this, we find this regulation in 29 C.F.R. 30.16–(a)–(3):

"When the Administrator determines that a State program is not consis-

tent with such standards, he shall notify the Secretary of Labor that a question exists as to whether the Federal Government should continue to recognize, for Federal purposes, programs registered by the State agency."

While no court has as yet had the problem, the Labor Department has construed this regulation, and we accept the construction. Their construction is:

"With respect to a State approved and recognized program, responsibility of this Department is to determine if the State program as a whole is consistent with the equal opportunity standards. When the Department determines that a State program is not consistent with such standards, it may withdraw recognition of the entire program, but does not have the responsibility to determine whether each individual apprenticeship program is in conformity with the State plan or program and has no authority to take enforcement action against a particular apprenticeship program."

In other words, the position of the Department of Labor is that the relationship between the Federal and locals in this situation would excite the interest of a believer in communal Divine Providence.

The point about the situation as it arises in this case is this. It might be interesting to go into the question what should be done if the Bureau of Apprentice Training of the Department of Labor at Cincinnati found the Cincinnati electrical apprenticeship plan to be non-conforming, either in formality or operation. Fortunately, we do not have the problem, because the Bureau of Apprentice Training of the Department of Labor of the United States Government, Cincinnati agency, found conformity in each instance. It is no answer to "What is the effect of an affirmative finding" to say that if our findings had been negative we could not have done anything about it.

## Order in No. 6421

It is hereby ORDERED, ADJUDGED and DECREED:

1. Local 212 shall immediately admit plaintiff Anderson L. Dobbins to full membership in Local 212, with all rights and privileges attending such membership. Admission to membership shall be conditioned only on an oral or written request by Dobbins addressed to any official of Local 212 expressing his desire to obtain such membership and indicating his intention upon admission to Local 212 to terminate his job as an independent electrical contractor. No approval by any officer or by the membership of Local 212 shall be required prior to such admission. Nor shall Dobbins be required to pay any dues or fees other than those which normally arise at the date of inclusion of his name on Local 212's membership rolls. The date of admission shall be effective as of September 14, 1965, for purposes of any future work or referral. Dobbins shall immediately be referred for work with a contractor party to Local 212's collective bargaining agreement and shall be credited on Local 212's records for purposes of any future work or referral as having worked within the electrical trade since January 1, 1965, for having worked for a union contractor since September 15, 1965, and for having passed IBEW journeyman electrician's examination.

Dobbins shall recover his costs in this action. The costs will include reasonable attorneys' fees for the reasonably necessary services of counsel rendered up to and including the time this action was consolidated with United States v. Local 212, Civil No. 6473, nominal compensation for services between that date and the date of this decree, and reasonable compensation for services reasonably rendered hereafter in the determination of questions of law and fact pertaining to this cause, as distinguished from No. 6473.

2. This Court retains jurisdiction of this cause for the sole purpose of determining the counsel fees referred to in No. 1 above. Jurisdiction is not otherwise retained.

## Order in No. 6473

It is hereby ORDERED, ADJUDGED and DECREED as follows:

1. Defendant Local 212, its officers, agents, employees, successors and all persons in active concert or participation with them in the administration of the business of the Local are hereby permanently enjoined from engaging in any employment practice which discriminates on the basis of race or color. They shall receive and process applications for membership, affiliate with contractors, recruit members, refer for employment, and otherwise operate the affairs of Local 212 without regard to race and so as to insure that no individual is excluded from work opportunities on the basis of race or color.

### MEMBERSHIP

2. Local 212 shall offer examinations for direct journeyman membership at least once every three months for the next five years whenever there are applicants for journeyman membership. Each applicant who meets the prerequisites for taking this examination shall be given at least two weeks' notice of the date and place of examination and the nature of the examination.

3. Local 212 shall impose no prerequisites for taking examinations for membership other than the following:

a. Over apprenticeship age.

b. Four years of experience in the electrical trade including experience as an employee of a union or non-union contractor, self-employment as an electrical contractor or other employment as an electrician reasonably related to electrical construction work. Residential electrical work shall be counted as experience in the trade.

c. Residence in the geographical jurisdiction of the union at the time of the examination.

d. A pending application for membership in the International Brotherhood of Electrical Workers.

e. Employment by a contractor party to the Local 212 collective bargaining agreement at the time of application for membership.

Local 212 may omit or waive any of the above prerequisites as long as such omission or waiver is made without regard to race or color.

4. Local 212 shall conduct no examination, whether written or practical, which is not reasonably related to the skills required in the everyday work of the average construction electrician. In any event, any proposed examination shall be no more stringent than the electrician examination then currently being administered by the Northern Kentucky Electric Licensing Authority which this Court has found to be a reasonable examination.

5. Local 212 shall submit to the plaintiff United States and to the Court at least thirty days before the first examination administered under this order the following:

a. A copy of any written examination and a description of any practical examination.

b. A statement of the procedure to be followed in notifying applicants of the examination and the procedure to be followed in the administration and grading of the examination.

c. A copy of the description of the subject matter of the examination and the examination procedure to be mailed to the applicants.

No change shall be made in any of the above, after they have been submitted to plaintiff and the Court in accord with this order, without giving thirty days prior written notice to the plaintiff and the Court stating the proposed change and the reasons for the change.

6. Nothing contained herein is intended to interfere with Local 212's contractual right to require that an employee of a union contractor become a member of Local 212 within a specified time or to prevent Local 212 from substituting a practical examination consisting of on-the-job evaluation by union contractors for any union-administered examination.

7. Until further order of this Court Negro applicants for membership in Local 212 who meet the prerequisites for taking the examination and who successfully attain a passing grade on the examination shall be admitted to membership in Local 212. No vote by the membership or any constituent board of Local 212 shall be required prior to the admission of Negroes to membership until the further order of this Court.

8. Employment rights of an applicant for membership who fails a membership examination shall not be affected by Local 212 in any way. The applicant shall be allowed to continue his present employment for a union contractor, if any, and shall be referred out under any future referral system in any priority category which does not require passing a journeyman examination. Nothing in this order shall be construed to interfere in any way with the reasonable exercise by any union contractor of the right (whether basic or contractual, or statutory) to determine the fitness of any individual, whether named in this order or not.

9. Local 212 shall maintain for two years after any examination complete records of the examination, including, but not limited to, all applications for membership; copies of all notices sent to applicants; copies of any replies received from applicants; copies of the examination administered and score sheets for the examination; and if the examination is practical, summaries of the applicant's performance detailed enough to allow independent review.

10. Local 212 shall maintain complete records of each phase of its membership and employment practices. Every three months, Local 212 shall report to the Court and to plaintiff United States the name and race and date of application of

each applicant for membership, and the action taken with respect to him.

The records required to be kept by (9) above and this paragraph (10) shall be made available to representatives of the United States on motion and notice and further order of this Court.

11. Local 212 shall prepare a brief statement of its policies and requirements with regard to membership which shall be available to any applicant for membership and copies of which shall be posted prominently within the Local 212 office.

## REFERRAL

12. The system for referring electricians for employment set up in the Local 212's collective bargaining agreement is suspended until further order of this Court. Until such further order, no effect shall be given to any feature of the present referral system by Local 212 except as herein specifically provided. Applicants to Local 212 for job referrals shall be referred out in the order of their application for referral. Applicants whose names are already registered for referral under the four-category priority system shall have their applications considered in the order of registration without regard to the book in which they originally registered. The provisions of the present referral system which pertain to the right of contractors to directly employ electricians after forty-eight (48) hours' notice to the union (including the "bump-off" provision upon a union referral becoming available), processing of appeals before the Appeal Board in the case of referral disputes, the right of contractors to request employees of special skills and the right of the union to furnish employees of special skills as requested, and the right of contractors to request special referrals of foremen and the right of the union to fill such special requests for foremen shall not be affected by this order.

13. During the period of total suspension of the referral system, Local 212 shall submit weekly reports to the Court and the plaintiff indicating the name and race and date of registration of each applicant for referral; when he was referred; and to which contractor he was referred. Said report shall also contain the names and race and special skills and categories, and contractor identification and foremen involved in all activity under the last sentence of No. 12 above and shall further contain the names and race of all 48-hour men (including an indication of whether such 48-hour men have ever heretofore been referred by the union).

14. Local 212 shall prepare within two weeks an application for a referral which shall contain space for setting out the applicant's name, address, age, race, telephone number, union affiliation, if any, and years of experience as an electrician. Such forms, when prepared, shall be submitted to plaintiff United States and to this Court.

15. Local 212 shall immediately take steps to devise a new referral system which shall not include any differentiation or priority based on union membership, the passing of a union examination or work for a union contractor. Such referral system may take into account other factors mentioned in 29 U.S.C. § 158(f) including training, experience and residence. All experience qualifications will be in terms of total experience in the electrical trade and shall include work for any contractor, or other employment as an electrician reasonably related to electrical construction work. Residential electrical work shall be counted as experience in the trade.

16. The referral system shall operate in such a fashion that applicants for employment will be able at any time during normal working hours, whether or not any particular union official is present, to fill out the application form for referral heretofore described and to sign, date and file such application.

17. Each person who enters the Local 212 offices to seek electrical construction employment shall be invited to place his name on the referral book and, after the application for referral has been prepared, to fill out such an application. No

person shall be referred unless he has filled out such an application and signed the book.

18. Local 212 shall specifically note the reason for refusal to refer any applicant and each applicant refused referral shall be specifically informed that he will not be referred by Local 212 and the reason that he will not be referred for employment.

19. Local 212 shall maintain a record of the name, race, date of application and date of referral of each applicant for referral. Each 30 days for the next year and thereafter at such interval as the Court shall direct, the defendant shall report to the Court and the plaintiff United States the number of applicants for referral by race, the number referred by race and in the case of each Negro applicant for referral, the category in which he was referred.

20. Local 212 shall maintain complete records of all phases of its referral process (including "foreman," "special skills," "48-hour men" matters and bump offs thereunder) which shall be made available for Government inspection on motion, notice and further order of this Court.

21. The referral system and the procedure for administering the referral system which is prepared by Local 212 in response to the above provisions of this order shall be submitted to plaintiff United States before it is put into operation. Unless plaintiff United States files an objection to the proposed referral system within 10 days with this Court, the proposed system shall be put into effect. If plaintiff United States objects to the proposed system, Local 212 shall be informed of the ground or grounds for objection. If agreement is not reached between the parties within five days after any such objection, Local 212's proposed system and the proposal of plaintiff United States shall be filed with this Court for direction as to which system or combination thereof or other system shall be put into effect.

22. The new referral system will remain in temporary effect and the old system will be temporarily suspended (subject to the exceptions specifically dealt with herein) pending further order of this Court. At any time after January 1, 1970, this Court will entertain a motion by either party raising the question of return to the old system or the permanent extension of the new or any included or relevant question for determination at that time in the light of intervening events. The guideline will be whether or not, as a practical matter, Negro electricians in the geographical area would be adversely affected by returning to the old referral system. If, in the light of events, a return (with protective orders dealing with individual Negroes) will not have such adverse effect, it may be then so ordered.

23. Local 212 shall prepare a brief statement of the operation of its referral system which shall be available to any new applicant for referral and copies of which shall be posted prominently within the Local 212 office.

CONTRACTORS

24. Local 212 shall make affiliation available to all similar contractors in the area without regard to race or color. Standards for contractor affiliation shall be no more stringent than those applied generally in the past. Nothing herein requires the union to organize any contractors; if it does, it is required to direct its efforts without racial effect; if it directs organizational efforts to a given type of white contractor, it is required to direct the same effort to any similar Negro contractor and the standards for affiliation shall be the same in each case.

SPECIFIC RELIEF FOR INDIVIDUALS

25. Local 212 shall immediately admit plaintiff Anderson L. Dobbins to full membership in Local 212, with all rights and privileges attending such membership. Admission to membership

shall be conditioned only on an oral or written request by Dobbins addressed to any official of Local 212 expressing his desire to obtain such membership and indicating his intention upon admission to Local 212 to terminate his job as an independent electrical contractor. No approval by any officer or by the membership of Local 212 shall be required prior to such admission. Nor shall Dobbins be required to pay any dues or fees other than those which normally arise at the date of inclusion of his name on Local 212's membership rolls. The date of admission shall be effective as of September 14, 1965, for purposes of any future work or referral. Dobbins shall immediately be referred for work with a contractor party to Local 212's collective bargaining agreement and shall be credited on Local 212's records for purposes of any future work or referral as having worked within the electrical trade since January 1, 1965, for having worked for a union contractor since September 15, 1965, and for having passed IBEW journeymen electrician's examination.

26. Local 212 is directed to refer forthwith on either written or oral request Charles Letcher, William S. Andrews, David A. Brown, William Harden, and William H. Sharpe, for work with union contractors for the next available work opportunity after the request is made. For all future referrals under any referral system these five individuals will be credited with work in the trade for union contractor from the respective date of the initial application for membership as set out herein: Charles Letcher, July 2, 1965; William S. Andrews, August 17, 1965; David A. Brown, August 13, 1965; William Harden, August 13, 1965; William H. Sharpe, July 20, 1966. Any of the foregoing individuals who, within one year successfully passes an examination for journeyman electrician, administered by the Northern Kentucky Electric Authority shall forthwith be admitted to Local 212 upon pres-

entation of evidence thereof to Local 212 with accredited membership as to the dates set out above.

27. Local 212 shall report to the Court and to plaintiff United States as soon as the required action with regard to the above individuals has been carried out.

28. This Court shall retain jurisdiction of this cause as to defendant Local 212 for all purposes including a continuing evaluation of the effectiveness of this decree, and of defendant Local 212's practices in providing equal employment opportunities for men of all races and color.

29. Each party to this action, plaintiff the United States of America, defendant Local 212 and defendant J.A.T.C. will pay its own costs. Docket fees waived.

## APPRENTICE PROGRAM

30. The Cincinnati Electrical Joint Apprenticeship and Training Committee (hereinafter simply "J.A.T.C."), its officers, agents, employees, successors, and all persons in active concert or participation with them in the administration of its apprenticeship program, are permanently enjoined from engaging in any employment practice, in such apprenticeship program, which discriminates on the basis of race. If recruitment efforts are made, such shall be made without discrimination based on race. The J.A.T.C. shall receive applications, test, evaluate, select applicants, and otherwise administer the electrical apprenticeship program without regard to the race of the applicant or apprentice.

31. The J.A.T.C. is mandatorily directed to arrange with the experts who administer the psychological aptitude tests and who evaluate the education of applicants to assign to each individual applicant a numerical grade within the limits of the standards and procedures [1] (as filed with the Bureau of Apprentice Training) and is directed mandatorily to

---

1. This phrase following "grade" does not dispense with the requirement of a math-

ematical grade certain, e.g. 51, for each applicant.

accept the numerical grades so assigned without change or variation; provided, however, that in instances in which such experts indicate by comment or remarks some reason for the exercise of discretion the J.A.T.C. may exercise unarbitrary and explicable discretion in scoring such results.

32. Frank Sawyer, on his written or oral application to the J.A.T.C., shall be offered the alternative of entering either the apprenticeship class starting in the fall of 1968 or in the fall of 1969. If Sawyer desires to enter the fall of 1968 class, he shall notify the J.A.T.C. on or before October 4, 1968, and in lieu thereof, his alternative to enter the 1969 class remains. If he desires to begin the apprenticeship program in 1969, he shall appropriately notify the J.A.T.C. in writing of his desire so to do on or before January 1, 1969. In the event of his election to enter one or the other in accordance herewith, he shall be admitted into the apprenticeship program without any testing, interviewing or other screening. The J.A.T.C. shall accomplish starting payments to Sawyer upon his entry into either the 1968 or 1969 class equivalent to 60% of the journeyman's wage for his first year, escalating to 75% his second year and 100% in each of his third and fourth years in the program (provided only that he remain in the course during such consecutive years and is successfully accomplishing it).

33. Jurisdiction of this cause as to the J.A.T.C. is retained by this Court for the purpose of enabling the plaintiff United States or the defendant J.A.T.C. to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the modification, construction or carrying out of the provisions of this Final Judgment and for the enforcement of compliance therewith and the punishment of violations thereof.

34. Any motion or application filed by any party under the provisions of this decree shall be preceded by a compliance with the rules of this District applicable to Discovery.